Filed 3/6/13  P. v. Swangler CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>PAUL THOMAS SWANGLER,<br><br>    Defendant and Appellant. | G045740<br><br>(Super. Ct. No. 09NF2768)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, John Conley, Judge.  Affirmed.

Nancy L. Tetreault, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

Paul Thomas Swangler appeals from a judgment after a jury convicted him of stalking with a prior felony stalking conviction, two counts of making a criminal threat, two counts of misdemeanor violating a protective order, and resisting and obstructing an officer. Swangler argues: (1) the trial court erred in denying his motion to revoke his right to represent himself; (2) the court erred in admitting his prior convictions pursuant to Evidence Code sections 1011 and 1109, and Evidence Code section 1109 violates the due process and equal protection clauses; (3) the court erred in instructing the jury on unanimity (CALCRIM No. 3500); and (4) the court erred in imposing a five-year term for his 1997 conviction in violation of federal and state ex post facto laws. We agree with one of Swangler's evidentiary claims but conclude he was not prejudiced. None of his other contentions have merit, and we affirm the judgment.

FACTS

In November 2008, Jamey F. met Swangler at an Alcoholics Anonymous (AA) meeting, and they dated until July 2009. Their relationship started well but Swangler became impatient and unpredictable in public when he and Jamey were together.

On July 12, 2009, Swangler and Jamey argued about him spending the night at her house. After he left, Swangler left over a dozen messages on her cellular telephone. Swangler became angrier and angrier with each message. Jamey eventually called him, told him their relationship was over, and asked him to retrieve his personal belongings. Jamey, who was afraid, went to stay with a girlfriend in Arizona for three days. Swangler continued to leave messages for Jamey, but she did not listen to them. Swangler called her girlfriend's home telephone number twice. Her girlfriend's husband answered the second telephone call and told Swangler to stop calling Jamey. Jamey's girlfriend, who was a counselor, advised her to get a restraining order.

Four days later, when Jamey returned to Orange County, she obtained a restraining order and had her son, James F., serve it on Swangler. Swangler continued to

2

contact Jamey: he sent her a birthday card; confronted her at the grocery store; and called her incessantly. Swangler called Jamey so many times she stopped using her home telephone. After Jamey changed her cellular telephone number due to Swangler's excessive calls, Swangler began calling James and left him nine antagonistic messages. Jamey feared for her son's safety. Jamey, who is a teacher, switched schools, shopped at different grocery stores, got a new cellular telephone, upgraded the alarm at her home, and began carrying pepper spray.

On August 6, 2009, at a court hearing with Swangler in attendance, Jamey obtained a two-year restraining order. The order prohibited Swangler from contacting or harassing Jamey, who was very scared of Swangler. After Jamey obtained the order, Swangler continued to leave her telephone messages, some of which pleaded for reconciliation and others which threatened her. Swangler also sent Jamey texts and e-mails. On one occasion, Swangler drove his car in front of Jamey's at a grocery store parking lot.

Three weeks later, Jamey went to the Anaheim Police Station and gave them a text, e-mail, and 22 voice mail messages she had received from Swangler. The next day, she reported more contact from Swangler. The following month, she reported increasingly angry contact from Swangler. While she was at the police station that day, Swangler called her and a police officer answered her telephone.

On September 12, 2009, Swangler called Jamey approximately 12 times threatening he would come to her house if she did not answer the telephone. That day, Brian Furfey, Jamey's neighbor, saw Swangler get out of his car, roll a bowling ball up to Jamey's front door, and drive away. Furfey knocked on Jamey's front door, and when she answered, he told her what Swangler had done. Jamey called the Anaheim Police Department. Although Jamey did not see Swangler throw the bowling ball, she knew the ball was Swangler's because it had their names on it. Jamey filed a police report the following day.

3

About two weeks later, Swangler called James and told him that he was going to "beat[] up" James. James reported the threat to the Anaheim Police Department because he was afraid Swangler may attack Jamey. Later that night, James saw Swangler drive by the house and throw a brick on the front lawn near Jamey's car. James called 911. Jamey was outside when she heard what sounded like movement on the bricks outside her bedroom window and then a car alarm. Minutes later, Furfey was knocking at her front door; he told her she needed to come outside. Jamey saw a brick near her daughter's car. Swangler slowly drove by, rolled down his window, and called Jamey a "'fucking whore.'" Jamey recorded the license plate and called the Anaheim Police Department.

Officer Sarah Shirvany was dispatched to Jamey's house. En route to the location, Shirvany reviewed the history of calls and saw there had been six reports taken. When she arrived, Jamey and Furfey were standing on Jamey's driveway. Jamey was shaking and crying and said she feared for her life. Jamey told Shirvany that Swangler was violating a restraining order. While Shirvany was with Jamey, Jamey's cellular telephone rang and Shirvany answered the calls but both times the line was disconnected. Jamey answered a third call and Shirvany listened to the conversation. Swangler, who yelled and cried, called Jamey a "whore," "slut," and "cunt." Shirvany had the call traced to a grocery store pay phone. Shirvany requested Fullerton police go to that address.

Officer Donald Blume of the Fullerton Police Department responded to the grocery store and found Swangler. Blume patted down Swangler but found no weapons or contraband. Swangler tensed up and did not sit down as ordered. Blume had Swangler sit down and told him to cross his legs until Anaheim police arrived. Swangler pulled his legs back quickly as if he was going to stand up and run. Blume put handcuffs on Swangler and put him in the back of the patrol car with the door open. Swangler became argumentative and slid his legs out of the car. Blume and his partner put Swangler back in the car and closed the door. Swangler kicked the passenger side

4

window.  Blume opened the door and yelled at Swangler to stop.  Swangler kicked Blume's partner in the shoulder.  They pulled Swangler out of the car and applied leg restraints.  After their supervisor arrived, Swangler banged his head against the back of the seat.  Blume grabbed his collar to stop him from hitting his head.  Blume turned on his recorder; Swangler was agitated and profane.

Shirvany told Jamey that Swangler was in custody.  Jamey explained that she previously had to tell her family, neighbors, and employer to be on alert and for the first time she felt safe.  Shirvany photographed the brick.

In the days following his arrest, Swangler called Jamey from the Orange County Jail.  He said:  (1) "Well babe, that was your last shot.  Now I hunt for you[;]" (2) "You fucken [*sic*] cunt.  Now it's game time, thanks to your kid.  Tell your kid he's the first one I'm coming for[;]" (3) "God, I can't wait till [*sic*] I get you.  God, I can't fucking wait.  You whore cunt[;]" (4) "I knew you were a whore.  I knew it.  I knew it.  I knew it.  See what it takes to find out you're a slut?  Huh?  You fucken [*sic*] cunt.  I swear on my mother's life, I can't wait till [*sic*] I get a hold of you[;]" and (5) "fuck you, whore.  Whore.  Whore.  Whore.  I swear to God, you fucken [*sic*] . . . ."  Swangler was frightened because she feared for her and her son's life.  From the time he was arrested until December 2009, Swangler called Jamey 308 times from the Orange County Jail.  Jamey was diagnosed with posttraumatic stress disorder.

In April 2010, an information charged Swangler with stalking with a prior felony stalking conviction (Pen. Code, § 646.9, subd. (a)-case No. 01NF2590-2002) (Pen. Code, § 646.9, subd. (c)(2))[1] (count 1), three counts of making a criminal threat (§ 422) (counts 2, 3 & 4), misdemeanor vandalism (§ 594, subds. (a), (b)(1)) (count 5), two counts of misdemeanor violating a protective order (§ 273.6, subd. (a))

---

[1]      All further statutory references are to the Penal Code, unless otherwise indicated.

5

(counts 6 & 8), and resisting and obstructing an officer (§ 148, subd. (a)(1)) (count 7). The information alleged Swangler had a 1997 prior strike conviction for making criminal threats in case No. 97NF2164 (§§ 667, subds. (d), (e)(1); 1170.12, subds. (b), (c)(1)), had one prior 1997 serious felony conviction for stalking in case No. 97NF2164 (§ 667, subd. (a)(1)), and served three prior prison terms (§ 667.5, subd. (b)).

At a pretrial hearing on January 7, 2011, before Judge Richard W. Stanford, Jr., Swangler filed a motion to relieve his defense counsel, his third such motion, pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*). The basis for Swangler's *Marsden* motion was the fact his attorney of over one year, Lee Gabriel, had been transferred to another court. Swangler was dismayed as he had developed a trusting relationship with Gabriel. Judge Stanford denied his *Marsden* motion. Swangler immediately filed a motion to relieve his deputy public defender and to represent himself pursuant to *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

After the trial judge thrice stated Swangler wished to represent himself because he "didn't get [his] way," the judge said, "You didn't get me to appoint another lawyer, so you would prefer to represent yourself rather than having counsel here represent you. That's your preference, apparently." Swangler answered he wanted to represent himself. After the trial judge stated he would continue the case for one month, the judge explained Swangler would be responsible for jury selection and evidentiary issues and he would receive no special treatment. Swangler insisted he wanted to represent himself. Judge Stanford relieved the deputy public defender and granted Swangler in propria persona status.

Swangler completed a "*Faretta* Waiver" form indicating he wished to represent himself and considered the following: "1) It is almost always unwise to represent yourself, and in so doing you may conduct a defense which may aid the prosecutor in convicting you of the charge(s)[.] [¶] 2) You are not entitled to any special privileges or treatment from the judge. The judge will require you to follow all the

6

technical rules of law, procedure, and evidence in the defense of your case and in the presentation of your defense. The judge will not aid you in your efforts to defend yourself. [¶] 3) The prosecutor will be an experienced, professional attorney who will not treat you leniently or in any special way even though you do not have the same skills or experience the prosecutor has. It will not likely be a fair contest since the prosecutor will have an advantage by reason of [her] skill and experience. [¶] 4) If you are in custody, you will receive no more library privileges than those available to other persons representing themselves. You will receive no extra time for preparation. You will have no staff of investigators at your beck and call. [¶] 5) If you elect to represent yourself, you will not be successful in any appeal based upon the quality of your representation. In other words, an allegation that you were denied 'effective assistance of counsel', that is you were 'incompetent' as a trial attorney, will not result in a new trial with competent counsel. [¶] 6) If you change your mind during the trial, you may not be permitted to obtain a postponement of the case while you obtain an attorney. [¶] 7) Your right to represent yourself may be ended, an attorney appointed for you, and you may be excluded from the courtroom of you misbehave during this case or seriously disrupt the trial." Swangler also indicated on the form he graduated high school and possessed a two-year paralegal degree. The trial court subsequently granted Swangler in propria persona privileges.

Over the next six months, Swangler, in propria persona, filed the following motions: (1) motion to compel discovery pursuant to section 1054.5; (2) motion to compel specific performance of a plea bargain agreement; (3) motion to compel discovery of peace officer personnel filed pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531; (4) motion in support of additional investigator funds; (5) motion to compel prosecution to elect between offenses; (6) motion for transcript of prior proceedings; and (7) motion to suppress his statements to law enforcement officers pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

On July 11, 2011, Swangler filed a motion to disqualify Judge Stanford pursuant to Code of Civil Procedure section 170.6. The criminal master calendar judge assigned the case to Judge John Conley for trial. The trial judge discussed with Swangler the trial rules in propria persona cases. The trial judge assessed Swangler's readiness and ability to represent himself. The judge noted Swangler had a paralegal degree and thus was "not the average pro per who may not understand what they're getting into." The judge noted the disadvantages of representing oneself in a criminal case. Based on this discussion, the trial judge permitted Swangler to continue in propria persona. Swangler completed another form indicating he wished to represent himself and he understood the disadvantages and consequences of doing so.

The same day, the prosecutor filed a motion to admit Swangler's prior convictions. Citing to *People v. Ogle* (2010) 185 Cal.App.4th 1138 (*Ogle*), the prosecutor moved to admit evidence of Swangler's 2002 conviction for stalking (§ 646.9), pursuant to Evidence Code sections 1101, subdivision (b), and 1109. The prosecutor argued the conviction was relevant to prove Swangler's intent and the reasonableness of Jamey's fear. The prosecutor asserted that for purposes of Evidence Code section 1109 and Family Code section 6211, the court had discretion to admit the conviction despite the fact the conviction was more than five years old. Citing to *People v. Garrett* (1994) 30 Cal.App.4th 962 (*Garrett*), a case in which the court concluded wife's knowledge of defendant's prior manslaughter conviction and evidence defendant had beaten his wife was admissible pursuant to Evidence Code section 1101 to show wife's fear to prove a section 422 offense, the prosecutor argued Swangler's "prior activities" were relevant to prove Jamey's fear. Swangler opposed that motion, contending simply Evidence Code section 352 prohibited their admission; he did not discuss the other relevant sections of the Evidence Code.

8

Swangler also filed the following motions: (1) motion to suppress his statements to law enforcement officers pursuant to *Miranda, supra,* 384 U.S. 436; and (2) motion to exclude relevant evidence pursuant to Evidence Code section 352.

The next morning the trial court conducted a hearing on Swangler's motion to suppress his statements to law enforcement. The prosecutor offered the officer's testimony, and Swangler cross-examined the officer. The court denied Swangler's motion.

At the same hearing, the trial court considered the prosecutor's motion in limine. The court explained it had read *Ogle, supra,* 185 Cal.App.4th 1138, *People v. Zavala* (2005) 130 Cal.App.4th 758 (*Zavala*), and *Garrett, supra,* 30 Cal.App.4th 962. With respect to the 2002 stalking conviction, the court stated there was an issue as to the five-year limit as to prior convictions in the Family Code. The court noted though Evidence Code section 1109 includes a 10-year limit for evidence of prior convictions. The court relied on the factors set forth in *People v. Falsetta* (1999) 21 Cal.4th 903, 917 (*Falsetta*), and explained it involves the same offense, it is not too remote, it would not confuse the jury, and it was not unduly prejudicial as the court would allow documentary evidence of the conviction and not witness testimony. The court ruled evidence of the 2002 stalking conviction was admissible pursuant to Evidence Code section 1101, subdivision (b), and 1109. As to the 1997 criminal threats conviction, the court's tentative was to admit evidence of the 1997 stalking conviction but the court reserved ruling until the case developed further.

After the trial court granted the prosecutor's motion to dismiss one of the alleged prior prison terms, Swangler moved to strike one of his prior strike convictions. The trial court denied that motion, and Swangler admitted he suffered the remaining prior convictions and served the prior prison terms. Jury selection began later that day and continued to the next morning.

9

After the prosecutor and Swangler delivered their opening statements, testimony began midday on July 13, 2011. James, Jamey, and Shirvani all testified for the prosecution for the remainder of the day. Jamey testified Swangler was charged with stalking his former wife. Swangler cross-examined each witness but his cross-examination of Jamey was brief. Swangler limited his questions to whether he had ever physically assaulted Jamey, she responded he had not, or whether he had ever threatened her face-to-face with great bodily injury or death, she also responded he had not.

The next morning, Swangler moved to have the trial court appoint trial counsel to represent him. Swangler stated: "Your honor, at this time, you know, I just - - it's pretty obvious that I don't know what I'm doing. I mean, I don't even know how to ask the proper question. And I don't know what to do. I mean, I really don't. I really thought I had a handle on the way this thing was and, you know, to me the way that I thought, I guess in layman's terms, a question is just a question, you know what I mean? I didn't -- I don't know what I'm doing."

The trial court inquired whether Swangler was asking for an attorney, and he replied he was. The court opined that if he were to appoint an attorney, no attorney would be able to substitute in and defend the case. Swangler suggested his former public defender, Gabriel, would be able to do so. The court mused that based on a public defender's typically large caseload, it was unlikely he would be available and he would likely need time to prepare. When the court asked whether Swangler was asking the court to declare a mistrial, Swangler answered he was asking the court to appoint an attorney. The court opined Swangler was frustrated because he was not prevailing and added, "Well, I don't think you're doing a bad job." The prosecutor opposed the request, arguing Swangler was repeatedly advised of the pitfalls in representing himself and three prosecution witnesses had testified. Swangler explained he had difficulty forming questions, his mouth was dry, and he was shaking.

10

The trial court inquired of Swangler: "Well, as the prosecutor just said, haven't repeated judges told you that you would be up against an experienced opponent, the judge could do you no favors, we can't give you legal advice? It's kind of like the one person and the lion. There's a lion in there, an experienced attorney, and you're not. But you were told that repeatedly, right?" Swangler admitted he was advised of the disadvantages of representing himself. The court reasoned: "And I'm looking at the practical effects. Here is what I would guess: If I re-appointed the public defender, they have cases already set, we would have to postpone your case three, four months, or more. They would have to reread everything, reorganize it. We would have - - we've wasted the time of the jurors. We've wasted the time with [the officer], probably four witnesses at this point. Your former girlfriend, who was very emotional during testimony, would have to testify again in a new trial. This court's time. I've spent Monday, Tuesday, Wednesday, and now we're starting Thursday on it. There are other cases we could have done in that time." Swangler again requested an attorney.

Based on the factors provided in *People v. Gallego* (1990) 52 Cal.3d 115, the trial court denied the motion. The court explained that Swangler was not "doing that bad." The court added the delay of three or more months was "the key factor[]" in its decision. Finally, the court stated it was unfair to the prosecutor, Jamey, the witnesses, and the jurors. The court noted numerous judges advised Swangler representing himself was unwise and Swangler signed forms indicating he voluntarily and intelligently made that choice. The court did not find it compelling Swangler just realized he made a mistake and changed his mind. The court concluded: ". . . *Faretta* is not a license to abuse the dignity of the courtroom or the orderly procedures of the court. [¶] Now, in the reverse situation, even motions to go pro per on the day of trial are usually untimely. This is in the middle of a trial. On like the fourth day. . . . Even request to go pro per close to the day of trial are disfavored. [Citation.] [¶] So, you've been a pro per for the last seven months. There's no attorney ready. We would have to declare a mistrial.

11

There's no way we could hang on to the jury for four more months. It's unfair to the jurors, the witnesses, the prosecutor, and the victim. Victims have rights under the victim's bill of rights. [¶] There's no right to change your mind in the middle of trial. And that will be denied."

The next day, the trial court granted the prosecutor's motion to dismiss counts 2 and 5. The parties stipulated to the following concerning Swangler's prior convictions: (1) on August 13, 1997, Swangler was convicted of violating section 422, criminal threats, a felony, against a former girlfriend, in case No. 97NF2164; and (2) on July 16, 2002, Swangler was convicted of section 646.9, subdivision (b), stalking, with a restraining order in effect, a felony, against the same former girlfriend, in case No. 01NF2590.

After the trial court denied his request to have defense counsel appointed, Swangler made a few objections to the prosecutor's questions on direct examination, continued to cross-examine the prosecutor's witnesses, made oral motions, examined his own witnesses, and testified on his own behalf.

Swangler testified that in 1997, he pled guilty to making criminal threats against a different former girlfriend, and after violating probation for that crime, he was sentenced to prison for three years. He admitted that in 2001, he was convicted of stalking the same former girlfriend. Swangler explained that after he was released from prison, he moved to a sober living home and attended AA meetings, where he met Jamey. Swangler learned Jamey had ended their relationship on July 12, 2009, when he found his personal belongings on her driveway. He admitted he was angry and they argued. Swangler stated he was angry when Jamey's son gave him the restraining order. He called Jamey a few times and they cursed at each other. Swangler testified he went to court and agreed to a two-year restraining order prohibiting him from contacting Jamey. Swangler conceded he violated the restraining order numerous times. Swangler claimed that despite the words he used, he had no intention of hurting Jamey.

12

On cross-examination, Swangler admitted he threatened his girlfriend and he was convicted of making criminal threats against her in 1997. He also admitted he was convicted of violating a restraining order and stalking the same woman in 2002. Swangler conceded he violated the restraining order by calling Jamey and driving on her street. Swangler testified he understood the terms of the restraining order but he chose to ignore those terms. He denied throwing a brick or rolling a bowling ball at Jamey's house and said he had previously left his bowling ball at her house. Swangler admitted calling Jamey from jail but denied he called her 308 times. Swangler admitted it sounded like he wanted to harm Jamey when he said, "I swear on my mother's life I can't wait to get a hold of you" and "I hunt for you."

Both the prosecutor and Swangler made their closing arguments. After deliberating for a little over one hour, the jury convicted Swangler on all remaining counts.

As he did before trial, Swangler filed a motion to compel specific performance of a plea bargain agreement. Swangler argued that to impose a five-year term for his 1997 criminal threats conviction violated his federal and state constitutional rights because that offense was not a serious felony when he committed it and to impose the five-year term was a breach of contract. Swangler did not argue imposition of the five-year term violated ex post facto laws but at the hearing, the court did indicate it was "very familiar" with those principles. The court denied the motion a second time.

The trial court sentenced Swangler to prison as follows: the middle term of three years on count 1; and eight months on counts 3 and 4. The court doubled the sentence under the Three Strike law for a total of eight years and eight months. The court also imposed a five-year term for the prior serious felony conviction. Swangler's total prison term was 13 years and eight months.

13

DISCUSSION

*I. Faretta*

Swangler argues the trial court erred when it denied his request to appoint an attorney to represent him at trial because the court did not conduct an informed and meaningful analysis of the relevant factors based on a totality of the circumstances. We disagree.

"When a criminal defendant who has waived his right to counsel and elected to represent himself under *Faretta*[*, supra,*] 422 U.S. 806, . . . seeks, during trial, to revoke that waiver and have counsel appointed, the trial court must exercise its discretion under the totality of the circumstances, considering factors including the defendant's reasons for seeking to revoke the waiver, and the delay or disruption revocation is likely to cause the court, the jury, and other parties. (*People v. Gallego* (1990) 52 Cal.3d 115, 163-164 . . . [(*Gallego*)].)" (*People v. Lawrence* (2009) 46 Cal.4th 186, 188 (*Lawrence*).)

"In *People v. Windham* (1977) 19 Cal.3d 121, 128 . . . [the California Supreme Court] explained that while a timely, unequivocal *Faretta* motion invoked the nondiscretionary right to self-representation, a *midtrial* motion was 'addressed to the sound discretion of the court.' In *People v. Elliott* (1977) 70 Cal.App.3d 984 . . . (*Elliott*), the Court of Appeal concluded the same was true of a midtrial request to revoke in propria persona status and have counsel appointed. [Citation.] Adapting the nonexclusive list of factors to consider mentioned in *Windham*, the *Elliott* court opined that a trial court should consider, along with any other relevant circumstances, (1) defendant's prior history in the substitution of counsel and in the desire to change from self-representation to counsel-representation, (2) the reasons set forth for the request, (3) the length and stage of the trial proceedings, (4) disruption or delay which reasonably might be expected to ensue from the granting of such motion, and (5) the likelihood of defendant's effectiveness in defending against the charges if required to

14

continue to act as his own attorney.' [Citation.] [¶] [The Supreme Court] cited *Elliott's* discretion framework favorably in . . . *Gallego, supra,* 52 Cal.3d at pages 163-164, adding, however, that ultimately the trial court's discretion is to be exercised on the totality of the circumstances, not strictly on the listed factors. Quoting *People v. Smith* (1980) 109 Cal.App.3d 476, 484, [the Supreme Court] explained: '"While the consideration of these criteria [listed in *Elliott* ] is obviously relevant and helpful to a trial court in resolving the issue, they are not absolutes, and in the final analysis it is the totality of the facts and circumstances which the trial court must consider in exercising its discretion as to whether or not to permit a defendant to again change his mind regarding representation in midtrial."' [Citation.] We found no abuse of discretion in the trial court's denial of the *Faretta* revocation request, in light of the defendant's history of counsel change requests, the advanced stage of trial (late in the guilt phase of a capital trial), and the trial court's inability to find an attorney who would take over at that stage without the need to declare a mistrial. [Citations.]" (*Lawrence, supra,* 46 Cal.4th at pp. 191-192, fn. omitted.)

*1. Defendant's prior history in the substitution of counsel and in the desire to change from self-representation to counsel-representation*

Although the trial court concluded this factor was not applicable, we note *Swangler* made three *Marsden* motions before making his *Faretta* motion. We also note Swangler tried to fire the deputy public defender, Gabriel, who he asked the trial court to re-appoint to represent him. The court did not rely on this factor, but it was not the first time Swangler tried to obtain new counsel. And as we discuss anon, the timing of his request was suspect.

*2. The reasons set forth for the request*

In making his request, Swangler explained to the trial court he did not know what he was doing and he did not know how to properly question the witnesses. He also alluded to the fact his mouth was dry and he was shaking. As an aside, what newly

15

minted attorney is not parched and quaking his first time in court. But like the defendant in *Lawrence*, Swangler had been repeatedly warned about the difficulties in representing himself. (*Lawrence, supra,* 46 Cal.4th at p. 195.) Indeed, he signed the "*Faretta* Waiver*"* acknowledging it was unwise to represent himself. And like *Lawrence*, "Nothing new or unforeseeable had occurred in the interim[.]" (*Lawrence, supra,* 46 Cal.4th at p. 195.) It is curious though that Swangler asked the court to appoint counsel after he had had the opportunity to cross-examine the victim, Jamey, and her son, James. Additionally, the record belies Swangler's claim he did not know how to question witnesses. In conclusion, "Buyer's remorse may not be an illegitimate reason for wanting to revoke a *Faretta* waiver, but neither is it a compelling one." (*Lawrence, supra,* 46 Cal.4th at p. 195.) Here, it is not a compelling one.

*3. The length and stage of the trial proceedings*

Swangler made his request to revoke his *Faretta* waiver after the jury had been sworn, counsel made their opening statements, the court ruled on Swangler's motion to suppress, and three prosecution witnesses had testified. This was the second day of what was estimated to be a four-day trial. Unlike *People v. Cruz* (1978) 83 Cal.App.3d 308, 320 (*Cruz*), the case to which Swangler analogizes, where defendant made his request to the master calendar judge before assignment to a courtroom, Swangler made his request in the middle of trial. More apt is *People v. Smith* (1980) 112 Cal.App.3d 37, 50 (*Smith*), where the court concluded defendant's request was tardy when he made it on the second day of trial *after* a victim had testified. As with the first two factors, this factor too weighs against Swangler revoking his *Faretta* waiver.

16

*4. Disruption or delay which reasonably might be expected to ensue from the granting of such motion*

Relying on *Cruz, supra,* 83 Cal.App.3d 308, and *Elliott, supra,* 70 Cal.App.3d 984, Swangler spends the most time addressing this factor.[2] In those cases, the prosecutor failed to establish any continuances "would cause a disruption in the calendar of the courts, that it would be detrimental to the prosecution of the cases, or that it would be contrary to the interests of justice." (*Cruz, supra,* 83 Cal.App.3d at p. 321, *Elliott, supra,* 70 Cal.App.3d at p. 998.) Based on this conclusion, the *Cruz* court went further and stated, "Due to this failure, it must be presumed that the continuance requested by defendant in the instant case would not have caused disruption to the court or prejudice to the prosecution beyond that normally involved in a three-week delay." (*Cruz, supra,* 83 Cal.App.3d at p. 321.)

Actually, the prosecutor did assert it was not in the interest of justice because it was a waste of judicial resources considering it was the middle of trial. And we decline to invoke the *Cruz* presumption. In *Lawrence*, the California Supreme Court explained that when a defendant requests to revoke a *Faretta* waiver "the trial court must exercise its discretion under the totality of the circumstances, considering factors including the defendant's reasons for seeking to revoke the waiver, and *the delay or disruption revocation is likely to cause the court, the jury, and other parties.*" (*Lawrence, supra,* 46 Cal.4th at p. 188, italics added.) Here, this experienced trial judge was certainly qualified to evaluate the Orange County Public Defender's typical workload and conclude Gabriel was likely unavailable and it would take him, or another

---

[2] Swangler also relies on *People v. Nague* (1991) 229 Cal.App.3d 1115 (*Nague*), and *People v. Hill* (1983) 148 Cal.App.3d 744 (*Hill*), but he does not provide any reasoned argument as to why they support his claims. *Hill* is inapposite because defendant made the request before jury selection. (*Hill, supra,* 148 Cal.App.3d at p. 761.) *Nague* is inapposite as it involved a posttrial request to revoke his *Faretta* waiver. (*Nague, supra,* 229 Cal.App.3d at p. 1124.)

17

public defender, time to prepare for trial. Although we conclude the trial court's determination was proper, the better practice may have been to take a short recess to call Gabriel and determine whether he was available and when he would be prepared to represent Swangler. Nonetheless, this factor too weighs against granting Swangler's request to revoke his *Faretta* waiver.

5. *The likelihood of defendant's effectiveness in defending against the charges if required to continue to act as his own attorney.*

In *Lawrence, supra,* 46 Cal.4th at page 196, the Supreme Court opined: "Similarly, defendant's asserted ineffectiveness at self-representation does not demonstrate an abuse of discretion. Defendant was untrained in the law and may not have been especially experienced in court procedures, but the same could be said of many, if not most, in propria persona criminal defendants. That defendant's defense would have been more effectively presented (or a better sentence obtained through a negotiated plea) had he been represented is likely. But if that fact were determinative, virtually all self-representing defendants would have the right to revoke their counsel waivers at any time during trial. That is not the law. [Citations.]"

Here, the trial court assessed Swangler was doing an adequate job representing himself. Although he was not a trained lawyer, Swangler did have a paralegal certificate and thus was not a complete novice in the law. Swangler made numerous written and oral motions, most of which were denied and a few which were granted. He cross-examined the prosecutor's witnesses and questioned his own witnesses. (*Smith, supra,* 112 Cal.App.3d at p. 51 [defendant effective where he made numerous written and oral motions].)

Therefore, we conclude the trial court properly denied Swangler's request to revoke his *Faretta* waiver because the court conducted a meaningful analysis of the relevant factors based on a totality of the circumstances. Because of our conclusion, we need not address Swangler's claim he was prejudiced.

18

## II. Prior Convictions

Swangler asserts the trial court erred in admitting evidence of his 2002 stalking conviction and 1997 criminal threats conviction. Although we agree the court erred in admitting Swangler's 2002 stalking conviction pursuant to Evidence Code section 1109, we conclude he was not prejudiced. None of his other claims have merit.

### A. Legal Principles

Evidence Code section 1101, subdivision (a), prohibits the use of disposition or propensity evidence to prove a defendant's conduct on a specific occasion. (*Falsetta, supra,* 21 Cal.4th at p. 911.) However, Evidence Code section 1101, subdivision (b), allows the trial court to admit "evidence that a person committed a crime . . . or other act when relevant to prove some fact (such as . . . intent, . . .) other than his or her disposition to commit such an act." In *People v. Ewoldt* (1994) 7 Cal.4th 380, 394, footnote 2, the California Supreme Court explained: "Evidence of *intent* is admissible to prove that, if the defendant committed the act alleged, he or she did so with the intent that comprises an element of the charged offense. 'In proving intent, the act is conceded or assumed; what is sought is the state of mind that accompanied it.' [Citation.]"

Additionally, Evidence Code section 1109, subdivision (a)(1), provides, "[I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by [Evidence Code] [s]ection 1101 if the evidence is not inadmissible pursuant to [Evidence Code] [s]ection 352."

Evidence Code section 352 acts as a safeguard when a prosecutor seeks to admit prior bad acts evidence pursuant to Evidence Code sections 1101, subdivision (b), and 1109, and a trial court may exclude the evidence. "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

19

(Evid. Code, § 352.) "'""The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues. In applying section 352, 'prejudicial' is not synonymous with 'damaging.'"" [Citation.] Relevant factors in determining prejudice include whether the prior acts of domestic violence were more inflammatory than the charged conduct, the possibility the jury might confuse the prior acts with the charged acts, how recent were the prior acts, and whether the defendant had already been convicted and punished for the prior offense(s). [Citations.]" (*People v. Rucker* (2005) 126 Cal.App.4th 1107, 1119.) We review a trial court's evidentiary rulings for an abuse of discretion. (*People v. Davis* (2009) 46 Cal.4th 539, 602.)

*1. 2002 Stalking Conviction*

Swangler claims the trial court erred in admitting his 2002 stalking conviction for the following reasons: (1) with respect to Evidence Code section 1101, subdivision (b), the prosecutor made no showing it was relevant as to his intent, and admission to establish Jamey's fear was reasonable was improper corroboration; and (2) as to Evidence Code section 1109, the conviction was not domestic violence as defined by section 13700 or Family Code section 6211. The Attorney General concedes the conviction was not domestic violence under section 13700 but otherwise disagrees. We will address each of Swangler's claims.

*a. Evidence Code section 1101, subdivision (b)*

The elements of the crime of stalking are (1) repeatedly following or harassing another person, (2) making a credible threat, and (3) with the intent to place that person in reasonable fear of death or great bodily injury. (*Zavala, supra,* 130 Cal.App.4th at pp. 766-767.)

The elements of the criminal threat offense are: "(1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the

20

statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat—which may be 'made verbally, in writing, or by means of an electronic communication device'—was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances. [Citation.]" (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228 (*Toledo*).)

Here, the trial court properly concluded the 2002 stalking conviction was relevant to prove Swangler's intent to commit count 1, and whether Jamey was in sustained fear as to counts 3 and 4. (*Ogle, supra,* 185 Cal.App.4th at p. 1143; *Zavala, supra,* 130 Cal.App.4th at p. 770.) As part of its burden of the proof for count 1, the prosecution had to establish beyond a reasonable doubt that Swangler intended to place Jamey in reasonable fear of death or great bodily injury. The fact Swangler had previously been convicted of the same offense would assist the jury in determining whether Swangler possessed the requisite intent. With respect to its burden of the proof for counts 3 and 4, the prosecution had to prove Jamey was in sustained fear and that fear was reasonable. Again, the fact Swangler had previously been convicted of stalking and Jamey was aware of his conviction would aid the jury in deciding whether Jamey was in sustained fear and whether her fear was reasonable.

The trial court also properly balanced the relevance of the 2002 stalking conviction against its prejudice as required by Evidence Code section 352. The court prohibited Swangler's former girlfriend from testifying about the conviction. Because the court limited the prosecutor to offering documentary evidence of the prior conviction, the prior conviction was not more inflammatory than the charged offense. And because it was a discreet act from 2002 involving a former girlfriend, it is unlikely the jury would

21

confuse the prior conviction with the charged offenses. The stalking conviction was just seven years old and thus it was not too remote to dissipate its relevance. Therefore, the probative value of the 2002 stalking conviction was not substantially outweighed by its undue prejudice.

Swangler relies on *People v. Brown* (1993) 17 Cal.App.4th 1389, 1396-1397, which held evidence of uncharged prior acts was not admissible "solely" for the "collateral issue" of "corroborat[ing] or bolster[ing] the credibility" of detectives who testified the appellant admitted molesting the victim in that case. *Brown* is of no aid to Swangler. As pointed out above, the 2002 stalking conviction was relevant to the issue of Swangler's intent. Thus, it was not admitted "solely" as corroborative evidence. We now address whether the conviction was admissible pursuant to Evidence Code section 1109. We conclude it was not.

*b. Evidence Code section 1109*

Swangler argues his 2002 stalking conviction was not domestic violence as defined by section 13700 or Family Code section 6211. The Attorney General concedes *Zavala, supra,* 130 Cal.App.4th 758, supports the conclusion the crime of stalking (§ 646.9, subd. (a)), is not domestic violence as defined in section 13700, but it argues stalking is domestic violence as defined by Family Code section 6211. We agree with the Attorney General stalking is domestic violence as defined by Evidence Code section 1109, subdivision (d)(3), and Family Code section 6211, if the stalking occurred within five years of the charged offense(s), which was not the case here. Thus, we conclude the trial court erred in admitting Swangler's 2002 stalking conviction pursuant to Evidence Code section 1109, but we find he was not prejudiced by the error.

Evidence Code section 1109, subdivision (d)(3), provides: "'Domestic violence' has the meaning set forth in [s]ection 13700 of the Penal Code. Subject to a hearing conducted pursuant to [s]ection 352, which shall include consideration of any corroboration and remoteness in time, 'domestic violence' has the further meaning as set

22

forth in [s]ection 6211 of the Family Code, if the act occurred no more than five years before the charged offense."

Evidence Code section 1109, subdivision (e), states: "Evidence of acts occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice."

Based on the trial court's comments at the hearing it appears the court relied on Family Code section 6211 in concluding the 2002 stalking conviction was domestic violence. The court referenced Family Code section 6211's five-year limit, and stated it had read *Zavala, supra,* 130 Cal.App.4th at pages 770-771, where the court concluded stalking was not domestic violence as defined by section 13700. Thus, we limit our discussion to Family Code section 6211.

As relevant here, Family Code section 6211 defines "domestic violence" as "abuse" committed against a person with whom defendant had a dating relationship. Family Code section 6203, subdivision (d), defines "abuse," in relevant part, as "any behavior that has been or could be enjoined pursuant to [Family Code] [s]ection 6320." Family Code section 6320 authorizes a trial court to issue an order prohibiting any person from "stalking, threatening, . . . harassing, [or] telephoning" another person. Thus, stalking clearly is domestic violence under Family Code section 6211 and is admissible pursuant to Evidence Code section 1109 if the prior stalking conviction occurred within five years of the charged offense.

Here, Swangler's stalking conviction did not occur within five years of the charged offenses. Swangler suffered his stalking conviction in 2002, and the charged offenses occurred in 2009, a span of seven years. We recognize Evidence Code section 1109, subdivision (e), states prior domestic violence convictions up to 10 years old are admissible. However, Evidence Code section 1109, subdivision (d)(3), further

23

limits domestic violence as defined in the Family Code to five years. The Family Code includes a more expansive view of domestic violence (*Ogle, supra,* 185 Cal.App.4th at p. 1144), but Evidence Code section 1109, subdivision (d)(3), circumscribes its reach by placing a more restrictive temporal limit on its applicability. Thus, we conclude the trial court erred in admitting Swangler's 2002 stalking conviction pursuant to Evidence Code section 1109 to show his propensity to commit the stalking offense. We must now address whether Swangler was prejudiced by that error. We conclude he was not.

*c. Prejudice*

Admission of Swangler's 2002 stalking conviction and the propensity instruction (CALCRIM No. 852) were harmless error because it is not reasonably probable Swangler would have obtained a more favorable result. (*Ogle, supra,* 185 Cal.App.4th at p. 1145.) The evidence against Swangler was overwhelming. There was undisputed evidence Swangler made countless threatening telephone calls to Jamey. The threatening telephone calls were confirmed by James and Shirvany. There was also evidence Swangler violated the restraining order. Indeed, Swangler admitted he violated the restraining order. On one occasion, Furfey saw Swangler roll a bowling ball up to Jamey's front door. Jamey and Furfey also provided testimony from which the jury could reasonably conclude that on another occasion Swangler threw a brick on Jamey's property. After police arrested Swangler, jail records establish he continued to call Jamey, 308 times, and continued to threaten her. This was certainly sufficient evidence for the jury to conclude Swangler stalked Jamey and made criminal threats to her. We discern no prejudice.

*2. 1997 Criminal Threats Conviction*

Swangler argues the trial court erred in admitting his 1997 criminal threats conviction for the following reasons: (1) with respect to Evidence Code section 1101, subdivision (b), the prosecutor made no showing it was relevant as to his intent and admission to establish Jamey's fear was reasonable was improper corroboration; and

24

(2) as to Evidence Code section 1109, the prosecutor did not seek to admit the conviction pursuant to Evidence Code section 1109 in her motion or orally at the hearing on the motion.

Preliminarily, we note that in arguing the trial court erred in admitting the 1997 criminal threats conviction, Swangler explains the issue was addressed at the hearing on the motion, the court's tentative was to admit it, and the court reserved ruling on the motion, but he asserts "the matter was not raised again." Swangler states, "Nevertheless, the jury was instructed pursuant to Evidence Code section 1109 that it could use the 1997 conviction to show propensity." The reason the issue was not addressed again was that Swangler and the prosecutor later stipulated to admission of Swangler's prior convictions. When Swangler stipulated to admission of his prior 1997 conviction after the trial court having reserved ruling on its admissibility, Swangler waived any claim the court erred in admitting it into evidence and instructing the jury it could consider the conviction in its deliberations. (*People v. Robertson* (1982) 129 Cal.App.3d 546, 548.)

In any event, assuming for purposes of argument that the trial court erred in admitting into evidence the 1997 conviction, any error was harmless as it is not reasonably probably Swangler would have received a better result had the conviction been excluded from evidence. As we explain above, there was overwhelming evidence of Swangler's guilt.

B. *Due Process*

Recognizing California courts have repeatedly rejected his claims but to preserve the issue for federal review, Swangler also contends admission of the prior domestic violence evidence under Evidence Code section 1109 violated his due process and equal protection rights under the United States Constitution. He did not raise this argument in the trial court, but the argument is cognizable on appeal. (*People v. Moore* (2011) 51 Cal.4th 386, 407, fn. 6 [Evidence Code section 352 objection preserves

25

constitutional arguments].)  The California Supreme Court has held Evidence Code section 1108 does not offend due process.  (*Falsetta, supra,* 21 Cal.4th at pp. 912-922.) That reasoning extends to Evidence Code section 1109.  (*People v. Johnson* (2010) 185 Cal.App.4th 520, 529-530 [Evidence Code section 1109 does not offend due process; cases cited therein]; *People v. Price* (2004) 120 Cal.App.4th 224, 240 [Evidence Code section 1109 does not violate due process or equal protections]; see *People v. Reyes* (2008) 160 Cal.App.4th 246, 251-252 [rejecting due process challenge to CALCRIM No. 852].)  Nothing Swangler says convinces us to depart from this well-settled authority.

III.  *Unanimity Instruction*

Although Swangler concedes he did not object on instructional grounds, he argues the trial court erroneously instructed the jury with a modified version of CALCRIM No. 3500 because it allowed the jury to convict him of counts 1, 3, and 4 based solely on one act.  The Attorney General contends Swangler forfeited appellate review of this issue because he did not object to the instruction.  In the interests of justice, we will address the merits of his claim, which ultimately has no merit.

"When a defendant is charged with a single offense, but there is proof of several acts, any one of which could support a conviction, either the prosecution must select the specific act relied upon to prove the charge, or the jury must be instructed that all the jurors must agree that the defendant committed the same act or acts.  [Citation.] When the prosecutor does not make an election, the trial court has a sua sponte duty to instruct the jury on unanimity.  [Citation.]"  (*People v. Mayer* (2003) 108 Cal.App.4th 403, 418.)

Here, the trial court instructed the jury with CALCRIM No. 3500, "Unanimity," as follows:  "The defendant is charged with [count] 1 stalking during the period of 8/13/09 to 12/8/09 and with criminal threats in [c]ounts 3 [and] 4 on or about September 25, 2009.  [¶]  The People have presented evidence of more than one act to prove that the defendant committed each of these offenses.  You must not find the

26

defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed."

The correctness of jury instructions is determined from the entire charge by the trial court and not from consideration of part or parts of an instruction. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248.) We assume the jurors are intelligent persons capable of understanding and correlating all jury instructions given them. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1148, overruled on other grounds in *People v. Rundle* (2008) 43 Cal.4th 76, 151.)

We agree the modified version of CALCRIM No. 3500 is not a model of clarity. But we conclude Swangler has not shown the trial court's unanimity instruction was reasonably likely to have been interpreted by the jury in the manner he suggests. (*People v. McPeters* (1992) 2 Cal.4th 1148, 1191, overruled on other grounds in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106-1107.)

First, a reading of the last sentence, while certainly susceptible to Swangler's interpretation, is more reasonably interpreted to mean the jury could not convict him of any of the offenses unless it agreed on the acts underlying the basis for each of the separate offenses. Second, the remaining instructions correctly informed the jury the prosecutor bore the burden of proving beyond a reasonable doubt Swangler committed each statutory element of each separate offense before the jury could find him guilty of those offenses. The trial court correctly instructed the jury on each of the statutory elements it must find to convict Swangler of each of the separate offenses. Finally, the prosecutor correctly explained to the jury it had to all agree on one act for each count. Thus, based on all the circumstances, a reasonable jury would have understood it was required to find Swangler had committed each of the requisite elements for each of the offenses beyond a reasonable doubt prior to finding him guilty on each of the counts. We simply cannot conclude the jury convicted him of three separate and different offenses, based on one act.

27

Finally, Swangler relies on *People v. Melhado* (1998) 60 Cal.App.4th 1529, 1534 (*Melhado*), to argue he was prejudiced by CALCRIM No. 3500. In that case, the trial court refused to instruct the jury on unanimity. (*Melhado, supra,* 60 Cal.App.4th at p. 1534.) Swangler's reliance on *Melhado* is misplaced as here the trial court did instruct the jury on unanimity.

## IV. *Five-Year Term Prior Serious Felony Conviction*

Swangler claims imposition of a five-year term for his 1997 criminal threat conviction violates ex post facto laws because that offense was not a serious offense under sections 667, subdivision (a), and 1192.7 in 1997. Not so.

In *People v. Ringo* (2005) 134 Cal.App.4th 870, 884 (*Ringo*), the court stated: "Based upon the plain language of section 667, subdivision (a), the crucial date for determining if a prior conviction qualifies as a serious felony is the date of the charged offense. If the alleged prior conviction is included in the list of serious felonies in section 1192.7 on the date of the charged offense, the prior conviction qualifies for the five-year enhancement under subdivision (a)."

Here, Swangler committed the offenses in 2009, and section 422, making a criminal threat was a serious felony at that time. (*Ringo, supra,* 134 Cal.App.4th at p. 884 [Proposition 21 expanded list of serious felonies in March 2000 to include section 422].) Although the *Ringo* court noted defendant "[e]schew[ed] an ex post facto argument" and limited his claim to one of statutory interpretation (*Ringo, supra,* 134 Cal.App.4th at p. 882), the *Ringo* court noted defendant conceded there was no ex post facto violation citing to *People v. Hatcher* (1995) 33 Cal.App.4th 1526. In *Hatcher*, the court explained other courts under varying circumstances have repeatedly upheld the use of prior convictions occurring prior to statutory enhancing provisions. (*Id.* at p. 1528.) "The sentence imposed upon an habitual offender is not an additional punishment for the earlier crime, but 'a stiffened penalty for the latest crime,' which is considered aggravated because of its repetitive nature. [Citations.]" (*People v. Sweet*

28

(1989) 207 Cal.App.3d 78, 83.)  Swangler received a stiffened penalty for committing the same offense in 2009 that he committed in 1997.  The court did not aggravate the 1997 offense but instead imposed an aggravated penalty for his recidivist behavior.  Thus, the trial court did not violate Swangler's constitutional rights by imposing a five-year term on his 1997 criminal threats conviction pursuant to section 667.

## DISPOSITION

The judgment is affirmed.


O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


MOORE, J.