[No. D016245. Fourth Dist., Div. One. July 15, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
HARRY ORR BROWN, Defendant and Appellant.

1390

## Counsel

Colleen Fahey Fearn and Jennifer L. King, under appointments by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, and Raquel M. Gonzalez, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**KREMER, P. J.**—Harry Orr Brown appeals his conviction by a jury of molesting a child under the age of 14 years (Pen. Code, § 288, subd. (a)). Brown contends his conviction must be reversed because the court improperly admitted evidence of prior uncharged molestations and gave incomplete instructions on the subject. We reverse.

### FACTS

#### The Prosecution's Case

In 1987, Brown lived with his wife, Tena, and his five-year-old identical twin daughters, J. and T. Brown and his wife finally separated in 1989 and divorce proceedings were commenced in June 1990.

J., who was 11 years old at the time of trial, testified that one day when she was 5 years old, and she and her sister were alone with Brown, she went into her parents' bedroom where Brown was watching television. Brown closed the door, pulled down her panties and told her to lie down on the bed. J. called out to her sister, but Brown told her to be quiet and he would not let her sister into the room until he pulled up her panties. J. testified after her sister left, "He raped me." She explained he put his "private thing inside my privacy." She stated it hurt "[a] little bit, but not that much" and she asked him to stop because she had to go to the bathroom at which point he stopped, carried her into the bathroom, closed the door, rubbed her butt and then sat her on the toilet.

J. also testified Brown "licked her privacy" and asked her to lick his private part but she did not "[b]ecause that part was disgusting." She stated Brown threatened to kill her if she told anybody.

J. testified she told her mother about the molestation about a month after her sister came home from the hospital after being treated for a leg injury. Her sister had been injured on December 10, 1990. J. told her mother on that day "[b]ecause that day my father wouldn't let me come over, and I wanted to come over. That I miss him so much." J. stated she had remembered what had occurred sometime before she turned 10 years old, but she had been afraid to tell her mother.

Two detectives from the Child Abuse Unit of the San Diego Police Department interviewed Brown at his home on January 11, 1991. During the interview, after being read his *Miranda* rights and agreeing to speak with the detectives, Brown admitted he had touched J.'s vaginal area, but had not entered her. He denied having oral sex with her. He said it only occurred on one occasion. When the detectives asked why he had chosen J. rather than her sister, Brown explained that J. had been available at the time. Brown said he felt guilty about what had happened with J. and believed it had something to do with the breakup of his marriage. To the detectives, Brown "seemed like a man who was glad to get something off his chest" and he seemed "remorseful."

J.'s elementary school principal and her fifth grade teacher testified J. was "truthful" and "honorable." An expert testified about the child sexual abuse accommodation syndrome.

### The Defense Case

Brown testified in his own defense. He denied molesting J. He testified about his stormy marriage with J.'s mother, including an incident early in their relationship when his wife hit him on the knee with a metal pipe and threatened him with a gun because she erroneously believed he was seeing another woman; a dispute in 1985 or 1986 when she had returned after leaving Brown with the girls, told him she had given another man her phone number, and Brown poked at her with a metal crutch while she threw a glass at him; and a time when she came to his workplace, hit him with a two-by-four for unknown reasons and he responded by grabbing her hair and throwing her to the ground.

Brown testified he began seeing Rewanda Bernard after he separated from his wife. Bernard went with him to the hospital when J.'s sister was hurt in December 1990. Brown's ex-wife would not permit Bernard near the children and threatened to call security if Bernard entered the room where J.'s sister was hospitalized. Brown testified his ex-wife failed to keep medical appointments for the follow-up treatment for J.'s sister so Brown called child protective services to report his ex-wife was neglecting the medical care of his daughter.

Brown denied telling the detectives he had molested his daughter. He testified he told the detectives he touched the vaginal area of his daughters only when they were young to change their diapers or to treat rashes. Brown testified he is "an affectionate parent" and plays games with his daughters. He explained the girls did not like to kiss him on the mouth so he would play

a game where he would offer his cheek to be kissed and then turn his head at the last minute so that the girls would kiss him on the mouth. Brown testified the detectives asked him if he had ever molested his niece Kimberly or one of his six sisters. Brown denied molesting and admitting molesting either his niece or any of his sisters.

On cross-examination, Brown admitted he had been ordered by a court not to live in a house with children under eighteen years old but had continued to live with Bernard and her three children who were under eighteen years old for four months after the court order issued, and as of a couple of weeks before the trial he was spending three to four nights a week at Bernard's house.

### Prosecution Rebuttal

In rebuttal, the prosecution called one of the detectives who had interviewed Brown. She testified she asked Brown if he had raped any of his sisters and he answered "yes, he did, but he never entered them." He said "they were five or six years old at the time." The detective also asked if he had sex with his niece Kimberly. Brown said "he had raped her but had not entered her."

The prosecution called Kimberly who was then 26 years old. She testified when she was about 10 years old Brown had raped her in a car behind an elementary school when Brown was taking her home one evening. After he raped her, he drove her home.

On cross-examination, Kimberly admitted she had told the detectives only that Brown had tried to touch her, not that he had touched her. She also told the detectives she had jumped out of the car and run home. She explained she decided to testify about the rape after a long talk with her Aunt Jojo. Kimberly testified the first time she told anyone about the rape was in November 1990. She first told her Aunt Jojo on November 22, 1990, who then told her sister, Brown's ex-wife, Tena. Kimberly testified Tena told her on November 27, 1990, about Brown molesting one of his daughters.

### Surrebuttal

Brown called the detective who interviewed Kimberly. The detective testified Kimberly said she was 11 or 12 years old at the time of the incident, did not say anything about Brown putting his penis in her and said she walked home.

Brown denied raping Kimberly and testified about an incident in 1978 when he had hit Kimberly because she ignored him, Kimberly had run to her

mother who told him not to touch her child's body, and later the mother's boyfriend had come to his place, beat him up and threatened to shoot him until Brown's wife intervened.

Brown was charged with two counts of child molesting. Count one alleged Brown committed a lewd and lascivious act on J. while count two alleged Brown put his mouth on the victim's vaginal area. The jury convicted Brown on count one but was unable to reach a verdict on count two. The court declared a mistrial on count two and eventually dismissed the count in the furtherance of justice upon the People's motion.

## DISCUSSION

 Brown contends the court erred in admitting and instructing the jury on the evidence relating to prior, uncharged molestation incidents, i.e., his statements to the detectives admitting molesting Kimberly and his sister and Kimberly's testimony Brown had molested her. He contends the uncharged acts should have been excluded under Evidence Code section 1101 as improper character evidence and under Evidence Code section 352 because the probative value of the evidence was outweighed by a danger of undue prejudice.

The trial court ruled the evidence could not be admitted during the People's case-in-chief, but could come in if Brown testified and denied making the statements to the detectives that he had molested his daughter, sister and niece. When the court denied Brown's motion to exclude the evidence, it explained: "[I]f [Brown] denies that he made the statement, he brings into issue the entire credibility of the officer that took the statement and the entire statement, if he made representations that were later confirmed. Otherwise, why would the officer have any motivation to go out and talk to his sister and go out to talk to another person? He had to have said something, admitted something to her that triggered that. . . . [I]f [Brown] takes the position, hey, I never told this officer that I did any of these things, then it puts the entire statement in issue, and there are points of the statement that have been confirmed. And it goes directly to who is the more credible. Did he in fact make a statement that he molested his daughter, or did he not?"

Later, during the discussions on jury instructions, the court stated identity was "one of the reasons" the evidence of uncharged acts was admitted. The court stated admission of the evidence was not "on the basis of prior similar acts, but, rather, on the basis that it related to a denial now by Mr. Brown that he ever made the statements. And, therefore, it does go to the identity of the person who committed the crime."

The court modified CALJIC No. 2.50 and instructed the jury:

"Evidence has been introduced for the purpose of showing that the defendant committed crimes other than that for which he is on trial.

"Such evidence, if believed, was not received and may not be considered by you to prove that defendant is a person of bad character or that he has a disposition to commit crimes.

"Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show:

"The identity of the person who committed the crime, if any, of which the defendant is accused;

"The believability of a witness and the weight to be given the testimony of each witness."

■ Under Evidence Code section 1101, subdivision (a) evidence of uncharged offenses is inadmissible to prove a person's criminal disposition. Prior act evidence "is not admissible solely to corroborate or bolster a witness's credibility. [Citations.]" (*People* v. *Pitts* (1990) 223 Cal.App.3d 606, 835 [273 Cal.Rptr. 757].) Evidence of prior uncharged acts, however, is not prohibited when relevant to prove some other fact, "such as motive, opportunity, intent, preparation, plan, knowledge [or] identity." (Evid. Code, § 1101, subd. (b).)

■ Nonetheless, "because other-crimes evidence is so inherently prejudicial, its relevancy is to be 'examined with care.' It is to be received with 'extreme caution,' and all doubts about its connection to the crime charged must be resolved in the accused's favor. [Citations.]" (*People* v. *Alcala* (1984) 36 Cal.3d 604, 631 [205 Cal.Rptr. 775, 685 P.2d 1126].) "The admissibility of other-crimes evidence depends on three principal factors: (1) the materiality of the fact sought to be proved or disproved; (2) the tendency of the uncharged crime to prove or disprove the material fact; and (3) the existence of any rule or policy requiring the exclusion of relevant evidence, e.g., Evidence Code section 352. [Citations.]" (*People* v. *Sully* (1991) 53 Cal.3d 1195, 1224 [283 Cal.Rptr. 144, 812 P.2d 163]; *People* v. *Gallego* (1990) 52 Cal.3d 115, 171 [276 Cal.Rptr. 679, 802 P.2d 169].)

■ Evidence Code section 352 authorizes the court to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create

substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." The court's exercise of discretion under Evidence Code section 352 will not be disturbed on appeal unless the court clearly abused its discretion, e.g., when the prejudicial effect of the evidence clearly outweighed its probative value. (*People* v. *Karis* (1988) 46 Cal.3d 612, 637 [250 Cal.Rptr. 659, 758 P.2d 1189].)

 Initially, we note, as the Attorney General concedes, the evidence was not admissible to prove identity because identity was not disputed in this case. (Compare *People* v. *Tassell* (1984) 36 Cal.3d 77, 88-89 [201 Cal.Rptr. 567, 679 P.2d 1].) There was no question that if the molestation occurred, Brown was the molester.

As to the court's second rationale for admitting the evidence, i.e., to bolster the credibility of the detectives' testimony that Brown admitted molesting J., we first note that, from the evidence in the record on appeal, it appears the court's chain of reasoning was flawed. The court reasoned the other molestation evidence tended to show Brown admitted molesting his sister and niece "[o]therwise, why would the officer have any motivation to go out and talk to his sister and [niece]? He had to have said something, admitted something to her that triggered that." The court reasoned an inference could be drawn that if the detectives were truthful in their testimony that Brown admitted molesting the sister and niece, the detectives were also truthful in their testimony Brown admitted molesting J.

The basis of the court's inference appears to be that Brown volunteered information about the sister and niece to the detectives, i.e., that the only way the detectives knew about the sister and niece was from their interview with Brown. The evidence in the record, however, suggests Brown did not volunteer the information but responded to questions asked by the detectives. Both Brown and the detective testified the detective asked Brown about molesting the sister and niece, specifically asking about Kimberly. If this is indeed the case i.e., that the detectives brought up the niece and sister, then no inference can be drawn from the officers' knowledge of the niece and sister that Brown must have confessed to molesting J.; the evidence instead leads only to an inference Brown had a propensity to molest young girls.

Even if the court was correct in its premise that the officers' knowledge of the incidents involving the niece and sister derived from Brown's volunteered statements, we believe the evidence should have been excluded.

Here, the asserted purpose for admitting the statements and Kimberly's testimony was to bolster the detectives' credibility, i.e., to show the detectives testified truthfully. As a general rule, the courts have interpreted

Evidence Code section 1101 as not permitting introduction of uncharged prior acts *solely* to corroborate or bolster the credibility of a witness. (See *People* v. *Tassell, supra,* 36 Cal.3d 77; *People* v. *Pitts, supra,* 223 Cal.App.3d 606, 835; *People* v. *Key* (1984) 153 Cal.App.3d 888, 894 [203 Cal.Rptr. 144].) The cases cited by the Attorney General do not support admission of the prior uncharged crimes in this case. Those cases involved uncharged crimes which were found admissible for clearly proper purposes other than credibility or rebuttal (*People* v. *Dreas* (1984) 153 Cal.App.3d 623 [200 Cal.Rptr. 586]; *People* v. *Finney* (1980) 110 Cal.App.3d 705 [168 Cal.Rptr. 80]), or involved the defendant's incidental admission during cross-examination of a prior crime (he admitted he was on parole) to explain his conduct (*People* v. *Harris* (1981) 28 Cal.3d 935 [171 Cal.Rptr. 679, 623 P.2d 240]).

Here, the purpose for admitting the crimes involved a collateral issue; they were not admitted to prove Brown molested J. but whether the detectives were truthful. The court permitted a mini-trial on the prior molestations, allowing not only the detective's testimony Brown had admitted molesting Kimberly and a sister but also Kimberly's testimony Brown had, in fact, molested her. Whether Brown had molested Kimberly and admitted to molesting Kimberly and his sister were only tangentially related to whether the detectives testified truthfully when they stated Brown admitted molesting J.

The statements to the detectives and Kimberly's testimony presented a clear danger of undue prejudice. The prior uncharged acts involved the same conduct as the charged offense, i.e., molestations of young female relatives. There was a danger the jury would use the evidence to draw the impermissible inference that Brown was criminally disposed towards molesting young girls and therefore he must have molested J. This danger was enhanced because the evidence was not limited to Brown's statements to the detectives that he "had raped but not entered" his sister and Kimberly but included Kimberly's detailed account of Brown's molestation of her when she was a child.

The Attorney General argues that any danger of prejudice was dispelled by the court's instruction to the jury not to consider the evidence "to prove that defendant is a person of bad character or that he has a disposition to commit crimes." This same instruction, however, also erroneously told the jury the evidence might be relevant to the issue of identity. The instructions also ambiguously told the jury they could consider the evidence in determining "[t]he believability of a witness and the weight to be given the testimony of each witness." This ambiguous language could invite a jury to consider a

defendant's propensity to commit a crime; e.g., the jury could interpret the language to mean they could consider the evidence presented as to the other molestations as tending to show Brown was a child molester and therefore his denial of molesting J. was less believable.

Moreover, this was a close case. The victim's testimony was vague in many aspects and inconsistent in others.[1] The jury apparently found it to be a close case because they were only able to reach a verdict on one of the two counts.

We conclude the court erred in admitting the evidence of the other uncharged crimes. Any probative value of this evidence was clearly outweighed by a danger of undue prejudice.

## Disposition

The judgment is reversed.

Benke, J., and Froehlich, J., concurred.

---

[1]For example, J. was not sure how long she had lived at the house on Winston Drive or where they lived before or after Winston Drive and that her mother helped her to remember she was five years old when the incident happened. J. testified she saw her father until the last year before the trial, that she last saw him when she was seven or eight years old (she was eleven years old at the time of the trial) and that she did not know the last time she saw her father.