Filed 11/6/13  P. v. Moore CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>EARL KEVIN MOORE,<br><br>        Defendant and Appellant. | A133224<br><br>(Alameda County<br>Super. Ct. No. CH49975A) |

This case involves sexual conduct that began as a consensual encounter, but then became non-consensual when Earl Kevin Moore wanted the victim to engage in sexual conduct with another woman.  The victim did not want to do this, and appellant forced her to do so, despite her resistance.  The defense consisted of appellant's testimony that the entire encounter was consensual.

Moore was charged with two counts of forcible oral copulation in concert (Pen. Code, § 288a, subd. (d)(1)),[1] penetration with a foreign object (§ 289, subd. (a)(1)(A)), and attempted rape by a foreign object in concert (§ 264.1, subd. (a)).  A jury found Moore guilty on all four counts and Moore was sentenced to a prison term of 60 years to life.

On appeal, Moore alleges the following errors:  (1) the court improperly allowed testimony concerning prior instances of non-consensual sexual activity; (2) the court improperly responded to a question by the jury during deliberation, removing an element

---

[1]  Statutory citations are to the Penal Code, unless otherwise indicated.

1

of the count of attempted rape by a foreign object in concert from the jury's consideration; (3) the court erred by failing to hold a hearing pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*) when Moore requested a continuance, at sentencing, so that retained counsel could replace his appointed counsel; and (4) the sentence included two five-year enhancements for prior convictions, pursuant to section 667, subdivision (a)(1), even though only one enhancement was authorized, because the prior convictions were not brought and tried separately.

The People concede the sentencing error that Moore alleges and we strike one of the two five-year enhancements.

We conclude that in responding to the jury's query concerning the count of attempted rape with a foreign object in concert, the court erred and removed an element of that count from the jury's consideration. Because we are unable to conclude that, absent the error, the jury would have convicted Moore on this count beyond a reasonable doubt, we must reverse Moore's conviction on the count of attempted rape with a foreign object in concert. Because the sentence for that count was concurrent with the sentence on another count, our decision does not affect Moore's aggregate sentence.

We find no merit in Moore's other assertions of error.

Moore has also filed a petition for writ of habeas corpus, alleging ineffective assistance of counsel. Because Moore fails to make a prima facie showing of prejudice, we have denied his petition in a separate order.

## BACKGROUND

### I. *Procedural Background*

On January 11, 2011, the People filed an information charging Moore with two counts of forcible oral copulation in concert (§ 288a, subd. (d)(1)) (counts one and two); penetration with a foreign object (§ 289, subd. (a)(1)(A)) (count three); and attempted rape by a foreign object in concert (§ 264.1, subd. (a)) (count four).

The information also alleged prior convictions for the following violations: (1) possession for sale of a controlled substance (Health & Saf. Code, § 11351); (2) possession for sale of a controlled substance (Health & Saf. Code, § 11378);

2

(3) accessory after the fact (§ 32); (4) voluntary manslaughter (§ 192, subd. (a));
(5) voluntary manslaughter (§ 192, subd. (a)); (6) commercial burglary (§ 469);
(7) possession of a controlled substance (Health & Saf. Code, § 11350, subd. (a)); and
(8) false personation (§ 529).  The allegations of convictions for voluntary manslaughter carried subsidiary allegations of prior separate prison terms, without remaining free of custody for five years following release (§ 667.5); of being serious felonies within the purview of section 667, subdivision (a)(1); and of being prior strikes, requiring sentencing pursuant to sections 1170.12, subdivision (c)(2), and 667, subdivision (e)(2). The allegation of a prior conviction for commercial burglary also carried a subsidiary allegation of a prior prison term, without remaining free of custody for five years following release.

Testimony before a jury commenced on May 2, 2011.  On May 9, 2011, the jury found Moore guilty on all counts as charged.

Moore waived trial by jury on the prior offenses and on May 10, 2011, the court found true the allegations of prior convictions for voluntary manslaughter (fourth and fifth alleged prior convictions).

At the sentencing hearing on July 28, 2011, Moore requested a continuance because he had hired an attorney to replace his appointed counsel and the new attorney was unavailable.  The court denied the motion as untimely.  The court then denied Moore's *Romero* motion to strike the prior convictions found true by the court.  The court imposed sentence as follows:  (1) 25 years to life on count one, plus five years for each of the two prior manslaughter convictions, pursuant to section 667, subdivision (a)(1); (2) 25 years to life on count two, plus five years for each of the two prior manslaughter convictions, to be served concurrently with the sentence on count one; (3) 25 years to life on count three, plus five years for each of the two prior manslaughter convictions, to be served consecutively to the sentence on count one; and (4) 25 years to life on count four, plus five years for each of the two prior manslaughter convictions, to be served concurrently with the sentence on count three.  The aggregate sentence was 70 years to life.

On August 10, 2011, the court amended the sentence to strike the additional five-year enhancements for the two prior convictions from the sentences for counts two, three, and four, resulting in an aggregate sentence of 60 years to life.

On September 6, 2011, Moore filed a timely notice of appeal.

## II. *Factual Background*

### A. *The Prosecution Case*

### 1. *The Victim's Account*

Moore and the victim, A. Doe, had known each other for several months before the events at issue in this case. On September 24, 2010, shortly before midnight, Doe phoned Moore after she had had an argument with her boyfriend. Moore drove to a location in Richmond, where they had agreed to meet, and picked her up. Moore asked Doe for oral sex, but Doe said she would not do this in the car, and agreed to go with Moore to a residence in Fremont.

Moore drove with Doe to the home of Lashonda Pleas. When they arrived, Moore, Doe, and Pleas went to an upstairs bedroom. Pleas left to go to a store and, while she was gone, Moore and Doe had consensual sex. Pleas then returned.

Doe told Moore and Pleas that she could not have sex with Pleas present. Moore told Doe, "You got to do her. You have to go down on her." Doe refused, but Moore pushed her back on the bed as she tried to get up and told Doe that she and Pleas were going to "do" each other. As he held Doe down on the bed, Moore told Pleas to open Doe's legs and Pleas tried unsuccessfully to do so. Moore then maneuvered Doe's legs up and back while Doe was "hollering and screaming and fighting." Pleas then placed her mouth on Doe's vagina.

Pleas's two sons, who were in the residence, heard the screaming and forced open the door to the bedroom. Moore told the young men that "everything is all right" and as Moore and Pleas talked with them, Doe dressed and ran outside. Doe used her cell phone to leave messages with several people. One of these people was Wanda Lattier, who testified that in the voicemail message, Doe sounded scared, said she was with a man named "Kevin," and gave a car license number.

4

Pleas then came outside and told Doe that everything would be all right. Pleas asked if Doe smoked crack and Doe said that she did. Pleas offered to make Doe a crack pipe and Doe went back into the house, and returned with Pleas to the bedroom. Doe then smoked crack cocaine from a pipe that Pleas constructed. Doe stated that she was not surprised that crack was there because Moore had previously told her that he was selling or using it.

As Doe smoked, Moore told her that he would make her have sexual contact with Pleas. Doe refused and threw the pipe. Moore told Doe that she was being disrespectful and pushed her back onto the bed. Doe was "fighting and wrestling," saying "Please don't do it. Please stop." Moore pulled Doe's pants down from the back and inserted three fingers into Doe's anus, telling her she was going to "do it." As Moore did this, Pleas positioned her vagina close to Doe's face. Doe experienced pain from Moore's fingers in her anus and she was "hollering and screaming, telling him, no." Eventually, against her will, Doe put her mouth on Pleas's vagina. After Doe told Moore that she had done so, Moore told her that she would have to continue and that he was going to be forced to kill her because she was fighting him.

During the struggle, Moore began to stuff Doe's shirt into her mouth because she was yelling. He hit her on the side of her face and told her to be still. Moore told Pleas to get a rope and Pleas brought a cell phone charger cord. Moore threw it and said he had asked for rope. Moore then told Pleas he was going to "stick something in her" and directed her to find something. Pleas came back with a plastic water bottle. Moore then tried to insert the bottle into Doe's vagina, but was unsuccessful because Doe kept her legs tightly closed. Doe continued to scream and begged Moore to let her go.

Pleas's sons again came into the room and asked what was happening. Doe gathered her things, begged the sons to call the police, and went into a bathroom, where she saw that her face was bleeding. Doe then ran out of the house. She saw a car pulling into a nearby driveway and she asked the owner to call the police, which he did. One of Pleas's neighbors, Kevin Kohn, identified himself as the owner of the car and confirmed that he called the police for Doe, who appeared very upset.

5

Police Officer Lindsay Snyder responded to the call and described Doe as being "visibly upset, crying." Doe gave limited answers and was "hysterical."

## 2. *Doe's Injuries*

The jury was shown photos, taken of Doe after the police came, depicting injuries to Doe's face and eyes and bruises on an arm. Doe testified that Moore caused these injuries.

Betty Noey, a registered nurse, examined Doe on September 25, 2010. Noey observed redness on Doe's left upper arm and bruising on her right thigh and left inner leg. There was tenderness on multiple areas of Doe's head, and swelling of her right cheek. The right part of Doe's nose was swollen and there was a suction injury on her left cheek. There was also tenderness on the right side of the neck. The vaginal examination showed a white discharge.

During the examination, Doe related sexual acts that included penetration of the anus with the fingers, and attempted penetration of the anus with the penis. She did not have signs of bruising or bleeding at her anus, but that did not mean she could not have been penetrated with fingers.

## 3. *Pleas's Account*

Pleas, who had entered a plea to reduced charges in exchange for truthful testimony, testified that she had been involved in a sexual relationship with Moore for six years. She described Moore as an abuser who would physically assault her. Moore had punched her, slapped her, kicked her, and twice had tried to run her over with his car. Moore threatened to kill her if she left him.

Pleas's description of the incident was consistent with Doe's regarding the use of force and Doe's repeated refusal to participate in oral sex with Pleas. After Moore and Doe arrived at her residence, she went to the store. When she returned, Moore wanted Pleas to perform oral sex on Doe, and when Doe said she did not do that with women, Moore tried to pry open her legs. Moore eventually maneuvered Doe's legs over her head and Pleas complied with Moore's direction to perform oral sex on Doe.

6

When Pleas's sons broke into the room, Moore told them he was not hitting Pleas. Doe then left. Pleas went outside, saw that Doe was upset, and they discussed smoking crack. Doe returned to the house, where Moore gave her crack.

After Doe smoked the crack, Moore told her that she was going to perform oral sex on Pleas. Doe refused, but Moore put Doe's head between Pleas's legs. Doe was crying and Moore put his fingers in Doe's anus. Doe asked Moore to stop and seemed to be in pain.

Pleas testified that Moore told her to get a bottle, but did not say why he wanted it. She gave him a bottle and then left the room. When Pleas returned, Doe was on the floor and Moore was on top of her. It appeared to Pleas that Doe and Moore were struggling. Doe was crying and Moore told her to be quiet. One of Pleas's sons returned to the room and Doe left the house.

Pleas stated that she did not want to have sexual contact with Doe, but complied with Moore's demands because she was afraid of him, stating that "[Moore] hits me and yells . . . if I say no." During their relationship, Moore had asked other women to have sexual contact with Pleas. On more than five occasions, Moore forced a woman named Kimberly, now deceased, to engage in oral sex with Pleas. Pleas and Kimberly would refuse, but Moore would beat them with a belt or would throw objects at them. With other women, Moore would offer them drugs and then ask them to perform oral sex on Pleas. If a woman refused, Moore would slap her and on "a couple" of occasions, Moore forced the women to do what he wanted. Pleas believed that when Moore and Doe first had sex, it was consensual, but that the later sexual activity was nonconsensual.

Pleas's son heard yelling and screaming from his mother's bedroom that night and forced open the door, concerned for his mother's safety. He told the police he did not want to testify against Moore because of concerns for the safety of his family. He was afraid of Moore because Moore had bragged to him of murdering someone. The son denied seeing another woman in the room with Moore and his mother. He saw the other woman only later, after the police arrived.

7

**B.** *The Defense Case*

Moore testified on his own behalf. He admitted that he had prior convictions for possession of a controlled substance for sale and that he had sustained two convictions for voluntary manslaughter. He described the facts of the manslaughter offenses as occurring during a struggle with two men who were armed.

Moore admitted that he had had a sexual relationship with Pleas. He stated that on five occasions a third person was involved in sexual relations with him and Pleas. Kimberly and Doe were among the other parties involved.

On the day of the incident he met with Doe and took her to Pleas's house in Fremont. On the way there they were drinking and Doe was concerned about how she could smoke crack because she had lost her pipe. Doe also agreed to perform oral sex on Moore during the drive to Fremont. When they arrived at Pleas's house, Moore, Pleas and Doe went upstairs into the bedroom. Pleas then left to go to a store. While Pleas was out, Moore and Doe had sex.

After Pleas returned, Doe smoked crack and Moore asked Doe if she was ready to have sex again. Doe said that she was ready and Moore positioned her on the bed with her legs pulled back. Pleas then began to perform oral sex on Doe, while Doe performed oral sex on Moore. No physical confrontation occurred at this point.

Doe then smoked some more crack, after which Doe and Moore engaged in vaginal sex. Moore asked Pleas for some lotion and began rubbing it into Doe to prepare her for anal sex. While Moore penetrated Doe's anus with his finger to lubricate her, he asked Doe to perform oral sex on Pleas, but Pleas said she was not ready yet. Pleas moved down on the bed so that Doe's head was between her legs and Moore asked Pleas if Doe had performed oral sex. Pleas said that Doe had not, but Doe said that she had.

Moore denied that he hit Doe or forced her to have sex. Instead, he encouraged her to have sexual contact with Pleas by offering her more crack. Moore then penetrated Doe's anus with his penis, but Doe said it hurt and she leapt off the bed and started to put her clothes on. When she was partially dressed, Moore pulled her down to the floor with

him and asked her to allow him to have sex with her again. Doe asked for more crack and Moore said he would get it, but Doe started "hollering."

Pleas's sons, who were intoxicated, forced the bedroom door open and Moore told them that everything was all right and left the bedroom to talk with them on the stair landing. Moore said that he and Pleas's sons remained on the landing, talking, for a "couple hours at least."

Pleas left the house to go to the store again and Moore returned to the bedroom and asked Doe if she wanted to finish having sex. Doe asked Moore if he had more crack and Moore told her to wait until Pleas returned. When Pleas returned, Moore told Doe she would have to wait for crack because he didn't have any more. Doe then "got hostile" and said she was leaving. Moore gathered her clothes and pushed them into her hand and Doe "started flailing with both hands" at him. Moore struck out at her "out of reflex" and hit her once in the face with his fist. Doe then went into the bathroom and dressed.

When Doe left the bathroom, Moore told her he would take her back to Richmond. As they were walking out of the house, Doe "took off to the right and started yelling, help, help, somebody help me."

## DISCUSSION

### I. *Evidence of Prior Instances of Non-Consensual Sexual Activity*

Moore contends that the trial court erred in allowing the prosecution to question Pleas concerning instances in which Moore would force other women, including a woman named Kimberly, to have sexual contact with Pleas, against the will of both Pleas and the other woman.

### A. *Legal Standard*

Evidence Code section 1101, subdivision (a), provides that evidence of a person's character, including "evidence of specific instances of his or her conduct," is "inadmissible when offered to prove his or her conduct on a specified occasion." However, Evidence Code section 1101, subdivision (b), provides: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong,

9

or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

An exception to the prohibition of using specific instances of conduct to prove a defendant's disposition to commit an unlawful sexual act of which he or she is accused is provided in Evidence Code section 1108, subdivision (a): "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."

"The admissibility of other-crimes evidence depends on three principal factors: (1) the materiality of the fact sought to be proved or disproved; (2) the tendency of the uncharged crime to prove or disprove the material fact; and (3) the existence of any rule or policy requiring the exclusion of relevant evidence, e.g., Evidence Code section 352." (*People v. Sully* (1991) 53 Cal.3d 1195, 1224.)

We review for abuse of discretion a trial court's ruling under Evidence Code sections 1101 and 1108. (*People v. Rogers* (2006) 39 Cal.4th 826, 862; *People v. Loy* (2011) 52 Cal.4th 46, 61.)

## B. *Background*

During in limine proceedings, the prosecutor informed the court and the defense that Pleas had informed him about other occasions when Moore had forced women to have sexual contact with Pleas, becoming violent if the women refused. Pleas had informed him that a woman named Kimberly, now deceased, was one of the women that Moore coerced. Defense counsel objected to the admission of this evidence, stating that "it is a reach to use [Evidence Code section] 1108 for unknown people at unknown times and unknown locations without a specific victim or person." The trial court ruled that evidence of prior occasions when Moore coerced women to have sex with Pleas would be relevant and admissible under Evidence Code section 1108.

10

At trial, Pleas testified that on five or more occasions, Moore forced Kimberly to engage in sexual acts with Pleas, becoming violent if either Kimberly or Pleas refused to perform the acts he directed. Pleas also testified that Moore acted similarly with other women as well, on a total of more than 12 occasions.

After Pleas testified and before the case was submitted to the jury, the trial court, after consultation with counsel, decided to admit the evidence under Evidence Code section 1101, subdivision (b), to show common plan, rather than under section 1108. The jury was ultimately instructed that they could consider the evidence for the limited purpose of deciding whether or not the defendant had a plan to commit the alleged offenses. In evaluating this evidence, the jury was instructed to consider the similarity between the uncharged acts and the charged offenses.

## C. *The Trial Court Did Not Abuse Its Discretion*

Moore first argues that Pleas's testimony about uncharged acts was improperly admitted because "the principal reason for admitting the evidence . . . was to bolster the prosecution witnesses' credibility by telling the jury that [Moore] engaged in this type of conduct with other women." Citing the general rule that Evidence Code section 1101, subdivision (b), does not permit "introduction of uncharged prior acts *solely* to corroborate or bolster the credibility of a witness" (*People v. Brown* (1993) 17 Cal.App.4th 1389, 1397), Moore concludes that "the prosecution improperly used a witness to bolster her own credibility under the guise of section 1101, subdivision (b) 'common plan' evidence."

We find Moore's argument unpersuasive. If the jury had otherwise been inclined to disbelieve Pleas, Moore fails to explain how the prior acts evidence would have tended to rehabilitate her testimony in the eyes of the jury. Also, if the prior acts evidence was indeed probative for an issue before the jury, then whether or not it tended to corroborate or bolster the credibility of a witness, it was not introduced *solely* for that effect and the general rule that Moore cites does not come into play.

Perhaps recognizing that his first argument fails if the prior acts evidence was indeed probative for showing a common plan, Moore attempts to persuade us that it was

11

not probative, contending: "The basic question for the jury was whether [the sexual activity] was consensual (albeit unsatisfying due to the scarcity of the promised cocaine) or violently non-consensual. The uncharged acts did not assist the jury due to the lack of certainty [as to whether those acts were 'sexual offenses' as required by Evidence Code section 1108]."

Pleas's testimony could not have made it more clear that Moore, on a number of occasions, enticed a woman, with the promise of drugs, to have sexual relations with him in the presence of Pleas, during which he would demand that the woman have sexual contact with Pleas and that, if the woman refused, he would slap her and, at least sometimes, force her to do what he wanted. This is exactly the scenario that Doe described and both relevant and highly probative to the question of whether Moore was following a common plan that resulted in the charged sexual offenses, or whether all the sexual activity was consensual. Whether or not the prior acts could have been admitted under Evidence Code section 1108 is simply not relevant to whether they were probative, under Evidence Code section 1101, subdivision (b), as evidence of a common plan.

Finally, Moore argues that the prejudicial effect of the prior acts evidence outweighed its probative value and that, under Evidence Code section 352, the evidence should not have been admitted.[2] Moore's argument depends on his prior contention that the prior acts evidence had little, if any, value in demonstrating a common plan, a contention we have rejected. Moreover, the prejudicial effect of this evidence was primarily cumulative, because the jury heard other evidence of criminal behavior, including drug and manslaughter charges, and Pleas's testimony about Moore's use of force and threats of force against her.

We discern no abuse of discretion by the trial court in admitting the prior acts evidence under Evidence Code section 1101, subdivision (b), to show a common plan.

_____

[2] Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

12

The evidence was probative as to whether Moore was following a common plan, making it material to the question of consent, and not unduly prejudicial—satisfying the three principal factors used to determine the admissibility of prior acts evidence.

## II. *Pleas's Participation in Count Four*

### A. *Background*

Count four of the information charged Moore with the attempted rape by foreign object (a violation of section 289, subdivision (a)(1)(A)), a water bottle, acting in concert with another person, a violation of section 264.1, subdivision (a), which provides: "The provisions of Section 264 notwithstanding, in any case in which the defendant, voluntarily acting in concert with another person, by force or violence and against the will of the victim, committed an act described in Section 261, 262, or 289, either personally or by aiding and abetting the other person, that fact shall be charged in the indictment or information and if found to be true by the jury, upon a jury trial, or if found to be true by the court, upon a court trial, or if admitted by the defendant, the defendant shall suffer confinement in the state prison for five, seven, or nine years." Charging Moore under section 264.1, subdivision (a), exposed Moore to a greater term of imprisonment than would a charge under section 289, subdivision (a)(1)(A).

The trial court instructed the jury that in order for them to find Moore guilty on count four, "the People must prove that [Moore] personally committed attempted rape by foreign object and acted with someone else who aided and abetted its commission." The court also instructed the jury concerning battery and simple assault as lesser included crimes of count four.

On May 9, 2011, the second day of deliberation, the jury asked the court for a reading of Pleas's testimony concerning the water bottle. The court stated that it would ask the reporter to prepare to do so. The jury then asked the court to define "acting in concert." The court directed the jury to the instruction already given. This was followed by a more specific question from the jury: " 'If Pleas did not aid and abet in concert on count 4 but [Moore] did do the act, is he guilty or not guilty?' " The trial court stated: "I think the best answer I can give you is that, Pleas's participation or lack thereof does not

13

have any bearing on [Moore's] guilt or lack of guilt for that offense. The basis for his—or your finding as to whether he has any culpability for that offense would be based simply on what you believe or not about the testimony of what he did or did not do." Defense counsel did not object to the trial court's answer.

The jury continued its deliberations and, about an hour and a half after being told that Pleas's participation was irrelevant, informed the court that it no longer needed to hear a reading of Pleas's testimony and had reached a verdict. The jury found Moore guilty of all four counts.

Moore contends that we must reverse the conviction on count 4 because the trial court erred in its instruction to the jury concerning the effect of Pleas's participation, or lack thereof, on Moore's culpability for count four.

## B. *Legal Standard*

"[A]n erroneous instruction that omits an element of an offense is subject to harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18." (*People v. Gonzalez* (2012) 54 Cal.4th 643, 663 (*Gonzalez*).) "In such cases, 'the harmless-error inquiry [asks]: Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' " (*Ibid*.) "Instructional error as to the elements of an offense is not waived by trial counsel's failure to object." [3] (*People v. Mason* (2013) 218 Cal.App.4th 818, 823.)

When the jury is given correct instructions and is then instructed in a way that tends to override the correct instruction by eliminating an element, a court will consider

---

[3] The People do not directly argue that Moore has forfeited this issue on appeal by failing to object at trial, but do cite some federal cases, none from the Ninth Circuit, that they characterize as suggesting that the defendant's fundamental rights are not affected when the alleged error does not affect the sentence. The cases cited by the People are *United States v. Ellis* (4th Cir. 2003) 326 F.3d 593, 600; *United States v. Burns* (6th Cir. 2002) 298 F.3d 523, 544-545; and *United States v. Rivera* (2d Cir. 2000) 282 F.3d 74, 77-78. All of these cases involved sentencing errors that did not affect the total time that the defendant would serve. They did not involve errors that call into question the determination of guilt on a criminal charge and we do not find them relevant to the issue at hand.

14

the prejudicial effect of the error "in the context of cases dealing with the failure to instruct on all elements of an offense." (*Gonzalez*, *supra*, 54 Cal.4th at p. 662.) "[T]here is no category of instructional error more prejudicial than when the trial judge makes a mistake in responding to a jury's inquiry during deliberations." (*People v. Thompkins* (1987) 195 Cal.App.3d 244, 252-253.)

## C. *Instructional Error Occurred and was not Harmless*

After properly instructing the jury, the jury asked the court if Moore could be found guilty on count four even if "[Pleas] did not aid and abet in concert." The court told the jury that "Pleas's participation or lack thereof does not have any bearing on [Moore's] guilt or lack of guilt for that offense." This contradicted the court's previous instruction that in order to find Moore guilty on count four, the jury must find that he "acted with some else who aided and abetted its commission."

The statutory language of section 264.1, "acting in concert," requires the participation of more than one person. (See *People v. Calimee* (1975) 49 Cal.App.3d 337, 341 ["The obvious purpose of the section is to provide increased punishment where there is a gang sexual assault and to insure that those who participate in such assaults, either by personally engaging in the ultimate sexual act or by voluntarily helping others to accomplish it, receive the enhanced punishment."] By telling the jury that it could find Moore guilty on count four without regard to what Pleas did or did not do, the court removed the element of "acting in concert" from the jury's consideration.

The People argue that the court's response to the jury's query "was correct in the sense that the jury could find [Moore] guilty on count four of the core offense of attempted rape by a foreign object irrespective of Pleas's participation." This begs the question. Count four was not the "core offense," attempted rape by foreign object (§ 289, subd. (a)(1)(A)), but attempted rape by foreign object *in concert* (§ 264.1, subd. (a)). While it is true that the jury had to find that Moore attempted a violation of section 289, subd. (a)(1)(A), and that Pleas's actions were irrelevant to that part of its determination, the query to the court was about count four, which also required a finding of acting in concert, for which Pleas's actions were crucially relevant.

15

Here, the instructional error removed an element of the charged crime from the jury's consideration. Because of this error, we must reverse unless we are satisfied that, absent the error, it is clear beyond a reasonable doubt that a rational jury would have found Moore guilty on count four.

Pleas testified that Moore asked her for a water bottle, without telling her what he wanted it for, and that she picked one up from the floor, handed it to him, and left the room. If the jury believed Pleas's testimony, then the jury could rationally conclude that Pleas did not aid and abet the attempted rape with the water bottle.

Doe testified that Moore asked Pleas for something with which to penetrate her and Pleas brought him an empty water bottle from the bathroom. If the jury believed Doe's testimony, then the jury could rationally conclude that Pleas aided and abetted the attempted rape with the water bottle.

The People argue that "[t]here is no reasonable probability that a juror who found that the attempted rape occurred, could have concluded that the handing or receiving of the bottle was not a direct act towards its commission." We agree, but the People continue: "Even if Pleas did not testify that she provided the water bottle with the specific intent to aid an attempted rape, the fact is that the jury must have credited [Doe's] testimony, and Pleas's testimony shows that she knew that when she provided the water bottle [Moore] was attempting a forcible sexual offense." Here we must disagree. The jury certainly credited Doe's testimony that an attempted rape with the water bottle occurred, but Doe's and Pleas's testimony diverged concerning what Moore said when he asked for the water bottle. A rational jury could credit Pleas's account over Doe's, or conclude that Doe's account of what Moore said was subject to reasonable doubt. A rational jury could also conclude that if Moore did not convey to Pleas his intent to rape Doe with the water bottle, that Pleas could reasonably not have known that intent. Even though Moore was forcing Doe to commit sexual acts, he had not, prior to asking Pleas for a water bottle, attempted to penetrate Doe with a foreign object, and a jury could reasonably conclude that Pleas had no reason to divine Moore's intent from the simple request of a water bottle. The jury's questions to the court suggest that this was the path

16

of reasoning that some of its members were following before the court informed them that Pleas's participation was not relevant.

The jury's questions to the court indicated that the jurors were having difficulty determining whether Pleas acted innocently in handing Moore the water bottle, or whether she acted as an aider and abettor. They requested that Pleas's testimony about the water bottle be re-read to them. Before that testimony was re-read, the court told the jury that what Pleas did or did not do was irrelevant to the question of Moore's guilt on count four and the jury very quickly reached a verdict without a re-reading of Pleas's testimony. On these facts, it is *not* clear beyond a reasonable doubt, that a rational jury would have found Moore guilty on count four absent the instructional error.

The conviction of Moore on count four is reversed.

### III. *Failure to Hold a* Marsden *Hearing*

In *Marsden*, the California Supreme Court recognized that "the decision whether to permit a defendant to discharge his appointed counsel and substitute another attorney during the trial is within the discretion of the trial court, and a defendant has no absolute right to more than one appointed attorney." (*Marsden*, *supra*, 2 Cal.3d at p. 123.) The *Marsden* court also held that when the defendant moves to replace his appointed counsel with another appointed counsel, "the trial court cannot thoughtfully exercise its discretion in this matter without listening to his reasons for requesting a change of attorneys." (*Ibid.*) The opportunity provided a defendant to state his or her reasons for requesting a change of attorneys is now referred to as a *Marsden* hearing.

Moore contends that when he requested a continuance of his sentencing hearing so that newly retained counsel could represent him instead of his appointed counsel, the court should have conducted a *Marsden* hearing, but failed to do so. Because of this alleged error, he asks us to reverse his sentence and remand for a *Marsden* hearing and appropriate further proceedings.

### A. *Background*

The jury returned its verdict on May 9, 2011. About two and a half months later, on July 28, 2011, the court conducted a sentencing hearing. For the first time Moore then

17

requested a continuance so that a privately retained attorney, rather than appointed counsel, could represent him in connection with sentencing and a motion for a new trial. Moore stated that his new attorney would not be available until the following week.

The court pointed out to Moore that "it doesn't make sense to have an attorney represent you at a sentencing hearing in a case that he or she had no contact or didn't try. And a person coming into the situation not knowing what happened at the trial and not having been at the trial would not really be in a position to make arguments to someone like me that would be very beneficial."

The court also noted that Moore had had two and a half months to file a motion for a new trial and continued: "So I can't simply sit here and let someone in your position show up on the day of sentencing . . . and say I want some time when you've had two and a half months. I mean the verdict was handed down by the jury on May 9th. Today's July 28th. So we're closer to three months than we are two. [¶] And during that entire time, I'm sure this has been something that has been on your mind and that you've thought about and talked to family members about it. And you've had plenty of time to make efforts to get counsel to represent you."

The court denied Moore's request for a continuance.

## B. *Moore Was not Entitled to a* **Marsden** *Hearing*

The People contend that "there is no duty to hold [a *Marsden*] hearing when a defendant seeks to discharge appointed counsel and to substitute *retained* counsel," relying on *People v. Courts* (1985) 37 Cal.3d 784 (*Courts*).

The defendant in *Courts* was represented by appointed counsel. (*Courts*, *supra*, 37 Cal.3d at p. 787.) The defendant attempted to obtain the services of an attorney for the upcoming trial, but lacked sufficient funds. (*Ibid.*) The defendant made a continuing effort to gather sufficient funds. (*Ibid.*) At a trial setting conference, appointed counsel informed the court that the defendant wanted a continuance in order to hire private counsel. (*Ibid.*) "The court denied the request, explaining that it was 'too late for coming into court . . . to be asking for another attorney'; [defendant] could not 'wait to the last minute and say [he wanted] a continuance.' " (*Id.* at p. 788.) The defendant shortly

18

thereafter did retain private counsel, the motion for a continuance was renewed, and the court again denied the motion. (*Id.* at pp. 788-789.) At a later hearing, the prosecutor made a reference to *Marsden* and the *Courts* court observed: "[R]eliance on *Marsden*, a case which involved the substitution of *appointed* counsel for another *appointed* counsel, was inapposite. The standards for evaluating such requests are quite different than those used in the retained counsel context." (*Id.* at p. 795, fn. 9.)

We agree with the People that *Courts* supports the proposition that *Marsden* is not implicated when a defendant seeks to substitute retained counsel for appointed counsel. Moore, however, argues to the contrary, citing *People v. Lucky* (1988) 45 Cal.3d 259 (*Lucky*).

In *Lucky*, the defendant contended that when his appointed counsel informed the court that defendant was considering retaining private counsel, the court had a duty to conduct a *Marsden* hearing. (*Lucky*, *supra*, 45 Cal.3d at p. 280.) The court ruled that "since defendant never moved for the discharge or substitution of his court-appointed attorney, and declined several opportunities afforded him by the court to state any grounds for dissatisfaction with [appointed counsel], the trial court was under no duty to make any further inquiries." (*Id.* at p. 283.)

What Moore relies upon in *Lucky* is the fact that the defendant was considering retaining private counsel and that the court observed: "[A] trial court's duty to permit a defendant to state his reasons for dissatisfaction with his attorney arises when the defendant in some manner moves to discharge his current counsel." (*Lucky*, *supra*, 45 Cal.3d at p. 281, fn. omitted.) Moore concludes from this that "the desire to discharge appointed counsel is subject to *Marsden* regardless of whether the defendant wants to replace such counsel with another appointed attorney or with an attorney who is privately retained."

We cannot regard *Lucky* as silently overriding *Courts*. In *Lucky*, the issue was whether or not the defendant had, in some manner, moved to discharge appointed counsel. The court held that he had not, and, thus, *Marsden* was not implicated. The fact that defendant was considering retaining private counsel was not a material fact that

19

helped the court reach that conclusion. The facts and issues here, and in *Courts*, are different. Moore, as did the defendant in *Courts*, actually retained private counsel and sought a continuance so that retained counsel could represent him in subsequent proceedings. In this situation, *Courts* observed that *Marsden* did not apply because it was limited to the case in which the defendant seeks to substitute appointed counsel for another appointed counsel.

We conclude that because Moore sought to replace appointed counsel with retained counsel, reliance on *Marsden* is inapposite, just as it was in *Courts*. Thus, the court was under no duty to hold a *Marsden* hearing. Moore does not argue that the trial court abused its discretion when it denied his request for a continuance and we do not reach that issue.

## IV. *Sentencing Error*

Section 667, subdivision (a)(1), provides: "In compliance with subdivision (b) of Section 1385, any person convicted of a serious felony who previously has been convicted of a serious felony in this state or of any offense committed in another jurisdiction which includes all of the elements of any serious felony, shall receive, in addition to the sentence imposed by the court for the present offense, a five-year enhancement for each such prior conviction on charges brought and tried separately. The terms of the present offense and each enhancement shall run consecutively."

The court imposed two five-year enhancements pursuant to section 667, subdivision (a)(1), for Moore's two manslaughter convictions. The information admitted into evidence concerning the manslaughter convictions shows that Moore was charged with both homicides in one proceeding. Because these two serious felonies were not "brought and tried separately," Moore contends that the court erred by imposing two five-year enhancements pursuant to section 667, subdivision (a)(1), instead of a single five-year enhancement. The People concede the sentencing error and we agree.

As a remedy, Moore asks us to simply strike one of the five-year enhancements imposed pursuant to section 667, subdivision (a)(1). The People argue that "[s]ince the court ordered that other priors be stricken, and its decision could have been influenced by

20

the fact that it imposed more than one five-year term, the matter should be remanded for resentencing."

Although the court did strike the remaining prior offenses alleged in the information for sentencing purposes, we find nothing in the record indicating that the court contemplated using them to enhance Moore's sentence. Moreover, we find no requests by the prosecution at sentencing that the remaining prior offenses be used to enhance Moore's sentence. We conclude that there is no need to spend judicial resources on a resentencing hearing. Accordingly, we strike the five-year enhancement added to the sentence for count one for prior offense five. The five-year enhancement for prior offense four remains.

## V. *Moore's Petition for Writ of Habeas Corpus*

In addition to Moore's direct appeal, he has filed a petition for writ of habeas corpus, alleging ineffective assistance of defense counsel at trial. This issue is presented in a writ petition because it is supported by declarations and a police report that are not a part of the trial record.

### A. *Background*

In his opening statement, Moore's counsel stated: "In our society there are people that you love to hate. . . . [Moore] is one of those people." Counsel then summarized for the jury the factual background of Moore's two prior manslaughter convictions.

When Moore testified at trial, his counsel asked him about two prior convictions for possession for sale of controlled substances in 1987. Moore admitted these convictions and, on further questioning, briefly described the facts underlying the convictions. Counsel then asked Moore about his two manslaughter convictions in 1990. Moore admitted these convictions and, on further questioning, provided his account of the events that led to those convictions. The prosecutor, on cross-examination, returned to the manslaughter convictions and questioned Moore extensively. Much of the prosecutor's questioning concerned the nature and extent of the gunshot wounds suffered by the two victims.

21

Moore's defense counsel, in a declaration accompanying Moore's petition, states that he believed the facts of the prior convictions would be admissible[4] and that he made the "tactical decision that it would be best for the defense if I introduced the facts during my opening statement and asked Moore about the facts instead of having the prosecutor elicit the facts for the first time on cross-examination."

## B. *Legal Standard*

"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction . . . has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).)

A defendant shows deficient performance by counsel by establishing that "counsel's representation fell below an objective standard of reasonableness," measured by "prevailing professional norms." (*Strickland*, *supra*, 466 U.S. at p. 688.)  To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 694.)

"An appellate court receiving [a petition for writ of habeas corpus] evaluates it by asking whether, assuming the petition's factual allegations are true, the petitioner would

---

[4] "Evidence of prior felony convictions offered for [impeachment] purpose[s] is restricted to the name or type of crime and the date and place of conviction." (*People v. Allen* (1986) 42 Cal.3d 1222, 1270.)  "Inquiry into the circumstances and underlying facts of the felony is prohibited when the evidence is offered for impeachment purposes only." (*People v. Santos* (1994) 30 Cal.App.4th 169, 176.)  Thus, defense counsel was mistaken that the underlying facts would be admissible to impeach Moore.

be entitled to relief.  [Citations.]  If no prima facie case for relief is stated, the court will summarily deny the petition." (*People v. Duvall* (1995) 9 Cal.4th 464, 474-475.)

**C.** *Moore Fails to Make a Prima Facie Showing of Prejudice*

Moore's primary charge of deficient representation is that, under the mistaken belief that the underlying facts of Moore's prior convictions would be admissible, defense counsel disclosed those facts in his opening statement and then questioned Moore about them, leading to an aggressive cross-examination.  Moore also contends that defense counsel (1) did not adequately investigate and prepare for Moore's testimony about his prior convictions; (2) did not object to questions that the prosecutor asked Moore during cross-examination about the prior convictions—questions that Moore now characterizes as improper and misleading; and (3) did not object to cross-examination concerning Moore's use of multiple aliases, dates of birth, and social security numbers. Moore claims both that (1) laying the facts of the prior convictions before the jury, which was not necessary, prejudiced Moore's case; and (2) the cumulative effect of all of defense counsel's alleged failures to meet professional norms prejudiced Moore's case.

We need not determine whether defense counsel's representation was actually deficient and fell below prevailing professional norms because we conclude that Moore has failed to make a prima facie showing of a reasonable probability that the outcome of his trial would have been different had the jury not heard the factual background of Moore's prior convictions and the prosecutor's cross-examination about those facts and Moore's use of aliases.

Moore's current case concerned sexual offenses that occurred in 2010 and his manslaughter convictions occurred in 1990.  The underlying facts of the manslaughter convictions had nothing to do with the facts of the present case.  Although those facts and Moore's use of aliases did not help him, we fail to see how they substantially added to Moore's problem of convincing the jury that his account was credible.  That Moore had two manslaughter convictions and prior drug convictions would have come to the jury's attention in any case.

Consent and coercion were the issues before the jury and Doe's credibility would have been the jury's primary focus. Doe's testimony was corroborated by Pleas on all material issues, except for what Moore said that prompted Pleas to hand him the water bottle. While there were discrepancies and inconsistencies between Doe's and Pleas's testimony, jurors understand that witnesses do not have perfect memories and observe events from different perspectives.

Doe's credibility was also enhanced by the testimony of other witnesses. Pleas's son was so alarmed by the yelling and screaming from his mother's bedroom that he forced open the door. Lattier confirmed that Doe had left a voicemail message in which she sounded scared, said she was with a man named "Kevin," and gave a car license number. Kohn, who called the police for Doe after she fled Pleas's house, said that Doe appeared to be very upset. Snyder, a police officer who responded, said that Doe was visibly upset and crying.

We find no reasonable probability that the jury did not accept Moore's account because their deliberations were contaminated by impermissible character assessments prompted by the underlying facts of the prior convictions or Moore's use of aliases. Besides the convincing, corroborated testimony of Doe, the jury had additional reasons to disbelieve Moore.

First, Moore's account did not include Doe leaving Pleas's house and then returning after Pleas talked to her. However, it was while Doe was outside that she left Lattier a voicemail message. Thus, Moore's account conflicted not only with Doe's and Pleas's testimony, but with Lattier's as well.

Second, Moore stated that after Pleas's sons broke into the room, he talked with them on the stair landing for at least two hours. This account conflicted not only with the testimony of Doe and Pleas's, but with that of Pleas's son.

Third, Moore stated that he hit Doe in the face once with his fist, out of reflex after she started flailing at him. While this may have explained the swelling of Doe's right cheek and swollen nose, it did not explain all of nurse Noey's observations, which

24

included redness on Doe's left upper arm, bruising on her right thigh and inner leg, and tenderness on multiple areas of her head.

Finally, Moore's account was that Doe "got hostile" after she realized that Moore could supply no more crack and, after leaving the house, began yelling for help. Moore significantly failed to explain why Doe would make false accusations of various sexual assaults simply because she was angry that he had no more drugs to provide her. His account conflicts with that of Kohn and Snyder, who found Doe to be upset, not angry.

There was no reasonable probability that, absent the testimony that Moore has called into question, the jury would have reached a different outcome. Moore has failed to make a prima facie showing of prejudice and we have denied his petition for writ of habeas corpus in a separate order.

## DISPOSITION

The judgment of the trial court is amended as follows: (1) the conviction and sentence on count four, a violation of section 264.1, subdivision (a), is reversed; and (2) the five-year enhancement to count one, imposed pursuant to section 667, subdivision (a)(1), for prior offense number five, is stricken. The judgment of the trial court is otherwise affirmed.

_____
Brick, J.*

We concur:


_____
Kline, P.J.


_____
Richman, J.


* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.