Filed 10/27/21  P. v. Hymas CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Plumas)

----

| | |
|---|---|
| THE PEOPLE, | C087737 |
| Plaintiff and Respondent, | (Super. Ct. No. F1700716) |
| v. | |
| ROBERT KIP HYMAS, | |
| Defendant and Appellant. | |

A jury found defendant Robert Kip Hymas guilty of corporal injury to a spouse, criminal threats, assault with a deadly weapon, two counts of child endangerment, and violating a protective order.  (Pen. Code, §§ 273.5, subd. (a); 422, subd. (a); 273a, subd. (b); 245, subd. (a)(1); 273.6, subd. (a).)  (statutory section citations that follow are to the Penal Code unless stated otherwise.)

Defendant raises the following contentions:

(1)  Insufficient evidence supports his conviction of assault with a deadly weapon;

1

(2)  The trial court instructed the jury on assault with a deadly weapon erroneously;

(3)  Evidence Code section 1109, which allows admission of prior acts of domestic violence into evidence, is facially unconstitutional;

(4)  Evidence Code section 1109 was unconstitutionally applied; and

(5)  Insufficient evidence supports his conviction of violating a protective order. We affirm the judgment.

### FACTS AND HISTORY OF THE PROCEEDINGS

Defendant and T.H. married in 2003.  They have four children.  Defendant worked as an officer for the California Highway Patrol.  He handled all of the family's finances.  All property was held solely in his name except for one vehicle, which was in T.H.'s name.  Defendant gave his ATM card to T.H. for shopping once each month.  T.H. did not have her own ATM card until a couple of years before trial.

T.H. began working for a charter school in 2015.  She was a licensed real estate agent, and she planned to earn and save money so she could open her own real estate office.  At defendant's suggestion, she entered a nursing program in 2017 at a local college.  She hoped the extra income would help pay for the children's college educations.  Initially, defendant was supportive.

During the first half of 2017, the couple's relationship was "rocky."  As T.H. started working with real estate clients, defendant became progressively insecure and angry.  He thought T.H. had a boyfriend.  He drank alcohol nearly every day.  His alcohol of choice was vodka.  When he drank, he became angry.

#### July 26, 2017 incident

On July 26, 2017, T.H. worked at the charter school.  She brought the children with her.  She left the school to pick up a paper from her nursing program at the college.

2

She took one of her children, seven-year-old L.H., with her. The other children remained at the school with a co-worker.

Driving back from the college, T.H. saw defendant in a car at an intersection. They headed in different directions, but defendant turned around and followed T.H. This concerned her. Since she had started the nursing program, defendant called her the "dorm room Madame." He interrogated her about what she did during her lunch break. She worried now about having to tell him that she had been at the college to pick up a paper. She drove home, and defendant followed her. On her way, she started the audio record function on her cell phone and placed the phone in her purse. The recording was played to the jury.

When T.H. got out of her car, defendant immediately asked her what she had been doing on that side of town. T.H. did not directly answer, fearing defendant would accuse her of being at the dorms if she said she had been at the college. Things quickly escalated. Calling her profane and obscene epithets, defendant continued to ask why she had been downtown and where were the kids. When T.H. said the kids were at school, defendant yelled, "Bullshit," and struck her in the chest. The punch knocked her to the ground. It hurt "very much" and caused her chest to bleed. Standing nearby, L.H. shrieked, "Daddy, why you hit mamma?"

Defendant went into a rage. In a tirade filled with profanity, abusive epithets, and obscenities, defendant told T.H. to call the police and have him arrested. He wanted to lose his job and be in prison because he did not care anymore. He wanted to be done with her and did not want to see his kids anymore because of her. He yelled, "I hate your guts. [Pause. Sobbing.] Please fucking call 'em, because I'm gonna fuckin' smash your fuckin' face in, because you won't tell me where the fuck you've been downtown . . . ."

Defendant begged T.H. to call the police: "Please call 'em. I'm begging you. Call 'em, because I want to be arrested. I want this to be over. I want to go to prison. I

3

really do. Spousal abuse. I hope you have a nice bruise that you can show 'em, your little buddies at Plumas Rural Services." The diatribe continued in this manner.

After it ended, L.H. asked T.H. to go back to the school. Inside the car, he quietly asked T.H. if she could lock the door.

T.H. drove back to work. She did not call police at that time out of fear.

October 17, 2017 incident

From July to October 2017, defendant and T.H.'s relationship worsened. Defendant had more frequent and intense outbursts and anger episodes. He started taking things out on the children. His arguments would not make sense, and he would get angry at anything.

On the nights leading up to defendant's birthday, T.H. would sleep with one of her daughters. About every 30 minutes to an hour during the night, defendant would come into the room, poke T.H. and wake her up. He would call her a "whore" or say she was cheating on him.

October 17 was defendant's birthday. T.H. made defendant a birthday cake that morning. She worked until about 5:00, then took the kids to soccer practice which she coached. Afterward, they stopped at the Dollar Store so the kids could buy birthday presents for defendant. Defendant and T.H. had often let the kids purchase birthday gifts at the Dollar Store. She and the kids got home around 7:00.

As they pulled up, T.H. saw defendant scurry into the house from the garage. Inside the house, T.H. turned on the light in the pool table room, and she saw defendant sitting on the floor cross-legged with his fingers in his ears and with a drink next to him. He asked, "What are you doing?" T.H. could tell he had been drinking a lot. He said to her, "Get the 'F' out of my face." The children were with her by then, and she took them upstairs.

4

The kids wrapped the presents they had bought, and T.H. made turkey burgers for dinner. The house had been clean the entire day except for the dinner dishes in the sink after they ate. Defendant came into the room and started yelling that he did not want anything for his birthday and did not want to be there. He left for about a half-hour and then returned and sat in his truck. One of the children invited him in to have his birthday cake.

When defendant entered the house, he started yelling at the family. When defendant was not looking, T.H. turned on her phone's recording function and was able to record much but not all of what happened. This recording was also played to the jury. Defendant launched into a profanity-laden tirade against T.H. and the children. He called T.H. abusive epithets and obscenities. He yelled about a messy house and T.H. making turkey burgers for his birthday. He criticized her for getting presents from Dollar Tree and having the kids wrap them in front of him and for not asking him what he wanted for his birthday dinner.

At some point, defendant warmed up some left-over tri-tip and started eating it in the kitchen. The children were also in the kitchen and the dining area. T.H. was standing by a counter in the nook area when defendant came over to about seven or eight inches from her. He screamed in her face. She felt his spit hit her face. He was holding a steak knife and a fork in his hands. He jumped up and down and stomped on the floor while waving his arms and the knife and fork up and down like in a jumping-jack. He stayed in front of her for a second doing this and then moved around the kitchen.

T.H. was scared and did not move. She feared if she moved back, he would move closer. She could not move forward because he was in her face. She felt she could not raise attention that he had a knife in his hand because she did not know how he would act in his anger. While this was happening, a couple of the children were near her and the others were at the table. T.H. feared defendant would harm her. He had threatened her before, and that factored into her concern for her safety.

5

Defendant threw various items while he raged. He threw a dish into the sink. He threw the children's presents and a toy belonging to L.H. across the room. He flipped his birthday cake over and dumped it upside down on the counter.

As the rant went on, defendant would leave the room and come back. One "pause" lasted six minutes. T.H. and the children waited silently in the kitchen. T.H. felt they could not leave while he was out of the room. In the past during defendant's rages, if he caught them trying to get in the car and leave, he banged on the windows, screamed, yelled, and blocked the car from leaving.

At some point, T.H. had the children pack overnight bags, and she took them to a cabin at a nearby lake.

Violation of the emergency protective order

Defendant was arrested. On October 19, 2017, a sheriff's deputy served defendant with an emergency protective order in jail. The sheriff's deputy explained to defendant that it was a protective order and he could not contact or be around T.H. and the children. The deputy did not read the entire protective order to defendant, but he left a copy of it either with defendant or with the jail personnel to put with defendant's property.

Among other things, the order stated that defendant "must not contact, either directly or indirectly, by any means, including but not limited to by telephone, mail, e-mail or other electronic means," T.H. or the children.

From jail, defendant contacted a friend, Greg Liechty, and asked him to relay four messages to T.H. Defendant gave Liechty T.H.'s cell phone number. The next day, defendant called T.H's cell and their house phone a total of 16 times.

On October 21, 2017, T.H. received a text message from Liechty. The text read:

"[T.H.], this is Greg Liechty. I wanted to make sure you got my message last night. Spoke to [defendant]. He asked me to text you since you won't take his calls. He

6

needs to tell you 4 Things: (1) Can you please bring his wallet with the Credit Cards in it? The wallet is in the Excursion.

"(2) He is likely getting fired. This means that you, nor the kids, will have any Medical Insurance and he loses his Retirement which means you lose that as well.

"(3) He said to see [*sic*] the Boat and the House and take the Money.

"(4) He wishes you would have just divorced him before going after his job."

On October 25, 2017, a deputy sheriff met with defendant at the jail to investigate the violation of the protective order. After receiving a *Miranda* warning, defendant stated he received the protective order but did not fully understand it at the time due to his emotional state. He said he called home to learn if his phone was shut off. He admitted having Liechty try to contact T.H., but he did not realize that was against the order.

Other evidence

The prosecution introduced other evidence at trial. An expert witness testified about domestic violence. Pursuant to Evidence Code section 1109, the prosecution also introduced evidence of nine other uncharged acts of domestic violence which defendant committed against T.H. from 2008 through 2017. We will discuss this evidence in more detail below.

Defendant testified on his own behalf. He also called several character witnesses.

Verdict and sentence

The jury found defendant guilty of corporal injury to a spouse, criminal threats, and child endangerment in the July 26, 2017 incident. It found him guilty of assault with a deadly weapon (a knife) and child endangerment in the October 17, 2017 incident. And it found him guilty of disobeying a domestic relations court order.

The trial court sentenced defendant to an aggregate prison term of five years, eight months as follows: the middle term of three years on the corporal injury count, a

consecutive eight months on the criminal threats count (one-third the mid-term), a consecutive one year on the assault count (one-third the mid-term), a consecutive one year in county jail for the count of violating a protective order; and six months concurrent for each of the child endangerment counts.

DISCUSSION

I

*Sufficiency of the Evidence of Assault with a Deadly Weapon*

Defendant contends that insufficient evidence supports his conviction of assaulting T.H. with a deadly weapon in the October 17, 2017 incident.

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)" (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890.)

"An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) Committing an assault with a deadly weapon or instrument other than a firearm can be a felony, as charged here. (§ 245, subd. (a)(1).)

In order to convict defendant of assaulting T.H. with a knife, the jury was required to find he "(1) willfully committed an act [with a knife] which by its nature would

8

probably and directly result in injury to [T.H.] and (2) was aware of facts that would lead a reasonable person to realize that a battery would directly, naturally, and probably result from [his] conduct. (*People v. Williams* [(2001)] 26 Cal.4th [779,] 790 [(*Williams*)].)" (*People v. White* (2015) 241 Cal.App.4th 881, 884.) Stated differently, the *Williams* test for assault "is whether a reasonable person, viewing the facts known to [the defendant], would find that the act in question would directly, naturally, and probably result in physical force being applied to another, i.e., a battery." (*People v. Bipialaka* (2019) 34 Cal.App.5th 455, 459.)

Substantial evidence shows that defendant acted willfully. When applied to the intent with which an act is done, the word "willfully" "implies simply a purpose or willingness to commit the act . . . . It does not require any intent to violate law, or to injure another, or to acquire any advantage." (§ 7, subd. (1).) Defendant purposely jumped, stomped, and waved his arms up and down with a knife in his hand while yelling at T.H. some seven inches from her face.

Substantial evidence also supports the jury's finding that the nature of defendant's act would probably and directly result in injury to T.H. Spewing vitriol, defendant stomped and waved a steak knife up and down while he was screaming at T.H. in her face. Understanding the context is important. Defendant made these actions in the course of a rant where he yelled at T.H. that she is "fucking sick," "evil," a "fucking pig," and worse, and declared "I fucking can't stand you[,] God damn you," "I despise you," and "[m]ove the fuck out." A reasonable person would conclude that waving the knife in front of T.H. in that context and by its nature would probably and directly result in injury to her.

Defendant does not challenge the jury's finding that he was aware of facts that would lead a reasonable person to realize that a battery would directly, naturally, and probably result from his conduct. Rather, he claims there was no evidence that his actions while holding the knife would have likely resulted in injury to T.H. He never

9

took a swing with the knife in T.H.'s direction.  His movements were not the preliminary motions of someone intending to use a weapon.  He argues that moving his arms up and down like in jumping jacks in front of T.H. while holding the knife may have been reckless or criminally negligent, but they did not constitute an assault.

Defendant's actions were not just negligent or reckless.  The jury could reasonably infer that he acted purposefully to frighten T.H. with physical menace, and his menace threatened T.H. with serious and imminent bodily injury.  His purpose of instilling fear moved his culpability beyond mere recklessness and into assault.  And he was successful; T.H. was scared so much that she would not leave the situation even when defendant left the room for a time.  An "attempt[] by physical menace to put others in fear of imminent serious bodily injury . . . is assault under *Williams*." (*People v. Bipialaka, supra*, 34 Cal.App.5th at p. 459.)

The jury was not required to find that he took a swing at T.H.  After determining defendant's act was willful, the jury had to determine whether defendant had the present ability to harm T.H. with the knife.  "A defendant has the ' " 'present ability to injure' ' " ' "[o]nce [he] has attained the means and location to strike immediately." ' (*People v. Chance* (2008) 44 Cal.4th 1164, 1174 [].)  In this context, immediacy means that the defendant has 'equip[ped] and position[ed] himself to carry out a battery . . ., even if some steps remain to be taken, and even if the victim or the surrounding circumstances thwart the infliction of injury.' (*Id.* at p. 1172.)" (*In re Raymundo M.* (2020) 52 Cal.App.5th 78, 85.)  There is no dispute that defendant had the present ability to harm T.H.

Moreover, whether his actions were the preliminary motions of someone intending to use a weapon is not the test of assault.  As this court explained elsewhere:  " '[A]ssault only requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another.' ([] *Williams,* [*supra*,] 26 Cal.4th [at p.] 790.)  'The mens rea [for

10

assault] is established upon proof the defendant willfully committed an act that by its nature will probably and directly result in injury to another, i.e., a battery. Although the defendant must intentionally engage in conduct that will likely produce injurious consequences, the prosecution need not prove a specific intent to inflict a particular harm. . . . The evidence must only demonstrate that the defendant willfully or purposefully attempted a "violent injury" or "the least touching," i.e., "any wrongful act committed by means of physical force against the person of another." [Citation.] In other words, "[t]he use of the described force is what counts, not the intent with which same is employed." [Citation.] Because the offensive or dangerous character of the defendant's conduct, by virtue of its nature, contemplates such injury, a general criminal intent to commit the act suffices to establish the requisite mental state. [Citation.]' (*People v. Colantuono* (1994) 7 Cal.4th 206, 214-215 [(*Colantuono*)].)" (*People v. Golde* (2008) 163 Cal.App.4th 101, 108-109.)

Here, substantial evidence supports the jury's findings that defendant willfully waved a knife up and down while screaming at T.H. seven inches away from her face, and that a reasonable person, knowing what defendant knew at that time, would conclude that the nature of the act would probably and directly result injury to T.H. The conviction for assault with a deadly weapon is supported by substantial evidence.

II

*Instruction on Assault with a Deadly Weapon*

The trial court based its instruction on assault with a deadly weapon on CALCRIM No. 875, but it omitted one of the crime's elements. The court instructed that to prove defendant guilty of the crime, the prosecution had to prove:

"1. The defendant did an act with a deadly weapon other than a firearm;

"2. The defendant did that act willfully;

11

"3. When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; [and]

"4. When the defendant acted, he had the present ability to apply force with a deadly weapon other than a firearm."

The court omitted a portion of the first element. The form instruction for the first element reads: "The defendant did an act with (a deadly weapon other than a firearm . . .) *that by its nature would directly and probably result in the application of force to a person*[.]" (CALCRIM No. 875, italics added.)

Defendant did not object to the court's instruction.

He contends here that the omission prejudicially violated his constitutional jury trial and due process rights by not instructing the jury on an element of the crime and by reducing the prosecution's burden of proof. He also argues that he did not forfeit his right to raise the contention on appeal. In the event we hold he forfeited the claim, he asserts his trial counsel rendered ineffective assistance by not objecting to the instruction.

Initially, we conclude that defendant did not forfeit this contention by not objecting below. " 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' (*People v. Andrews* (1989) 49 Cal.3d 200, 218.) But that rule does not apply when, as here, the trial court gives an instruction that is an incorrect statement of the law." (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012.) We may review any instruction given, "even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." (§ 1259.) A defendant's constitutional right to have all elements of the charged offense proven beyond a reasonable doubt is a substantial right. (*People v. Van Winkle* (1999) 75 Cal.App.4th 133, 139.)

12

The clause omitted from the instruction was a required element of the crime. As already stated, "The mens rea [for assault] is established upon proof the defendant willfully committed an act that by its nature will probably and directly result in injury to another, i.e., a battery." (*Colantuono, supra,* 7 Cal.4th at p. 214.)

Not instructing on each element of a crime is constitutional error. (*People v. Merritt* (2017) 2 Cal.5th 819, 824 (*Merritt*).) "It is, indeed, very serious constitutional error because it threatens the right to a jury trial that both the United States and California Constitutions guarantee. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 16.) All criminal defendants have the right to 'a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.' (*United States v. Gaudin* (1995) 515 U.S. 506, 510 [132 L.Ed.2d 444]; accord, *Apprendi v. New Jersey* (2000) 530 U.S. 466, 477 [147 L.Ed.2d 435].)" (*Merritt, supra*, 2 Cal.5th at p. 824.)

The omission of a crime's element in a jury instruction that does not amount to a total deprivation of a jury trial is reviewable for harmless error under the federal prejudicial error standard of *Chapman v. California* (1967) 380 U.S. 18 [17 L.Ed.2d 705]. (*Merritt, supra*, 2 Cal.5th at pp. 826, 831.) That standard requires us to determine "whether it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error." (*Id*. at p. 831.)

We conclude that a rational jury beyond a reasonable doubt would have rendered the same verdict absent the error. Another element of the form instruction included the missing element, and the trial court provided that element to the jury. The form instruction arises from the California Supreme Court's holdings in *Colantuono* and *Williams*. Maintaining that assault with a deadly weapon requires only a general criminal intent, *Colantuono* held that the required mens rea for assault was "proof the defendant willfully committed *an act that by its nature will probably and directly result in injury* to another, i.e., a battery." (*Colantuono, supra,* 7 Cal.4th. at p. 214, italics added.)

13

*Williams* added that the prosecution must also prove that the defendant had "actual knowledge of those facts sufficient to establish that the *act by its nature will probably and directly result in the application of physical force* against another." (*Williams, supra*, 26 Cal.4th at p. 790, italics added.) The *Williams* element incorporates the *Colantuono* element and requires the jury to determine both elements.

Here, the jury did not receive the *Colantuono* element in its instruction, but it did receive the *Williams* element. The court told the jury it had to determine that when "the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone." As a result, the jury by necessity had to determine whether defendant's act "by its nature would directly and probably result in the application of force" to a person. The jury thus considered the element the instruction omitted.

In addition, the prosecutor in closing argument recited the correct version of CALCRIM No. 875's first element. Reviewing the elements of assault with a deadly weapon, he said, "Number one is . . . the defendant did an act with a deadly weapon that, by its nature, would probably and directly apply the force to. The first element [is] . . . that they did an act that by its nature would probably result in the application of force." When reviewing a jury instruction, we "also must consider the arguments of counsel in assessing the probable impact of the instruction on the jury." (*People v. Young* (2005) 34 Cal.4th 1149, 1202.) Any possibility of confusion here was diminished by the prosecutor's argument.

Moreover, as concluded earlier, the evidence of defendant's guilt was strong. In a violent rage, defendant jumped and stomped seven inches away from T.H.'s face waving a steak knife up and down while screaming epithets and accusations at her. Under these facts and circumstances, a jury without a reasonable doubt would have reached the same verdict had the trial court given the jury the omitted instruction. Its error in not doing so was harmless.

14

III

*Facial Constitutionality of Evidence Code Section 1109*

The trial court admitted evidence of defendant's prior acts of domestic violence under Evidence Code section 1109.  That statute provides that in a criminal action "in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by [Evidence Code] [s]ection 1101 if the evidence is not inadmissible pursuant to [Evidence Code] [s]ection 352."  (Evid. Code, § 1109, subd. (a)(1).)  "Evidence of acts occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice."  (Evid. Code, § 1109, subd. (e).)

Defendant contends that Evidence Code section 1109 is facially unconstitutional as it allows a jury to consider propensity evidence in violation of his due process rights.  Defendant acknowledges that our court rejected this argument in *People v. Johnson* (2000) 77 Cal.App.4th 410, 416-420.

Defendant acknowledges that other appellate districts also have rejected the argument.  (See *People v. Johnson* (2010) 185 Cal.App.4th 520, 528-529; *People v. Cabrera* (2007) 152 Cal.App.4th 695, 703-704; *People v. Price* (2004) 120 Cal.App.4th 224, 240; *People v. Escobar* (2000) 82 Cal.App.4th 1085, 1095-1096; *People v. James* (2000) 81 Cal.App.4th 1343, 1353; *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1309-1310; *People v. Brown* (2000) 77 Cal.App.4th 1324, 1332-1334; *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1027-1028.)

These decisions remain good law, and we do not question them here.  Evidence Code section 1109 is not facially unconstitutional.

## IV

*Admitting Evidence under Evidence Code Section 1109*

Defendant claims the trial court abused its discretion in admitting evidence under Evidence Code section 1109 by not carefully weighing the relevant factors which Evidence Code section 352 required it to consider.

A.      Background

The prosecution moved to admit evidence of prior uncharged acts of domestic violence which defendant had committed against T.H.  The evidence concerned the following 12 incidents:

1.      In 2004-2005, defendant threw a drink at T.H. while interrogating her over whether she was cheating on him with a contractor working at their house. About this time, during a separate argument, defendant told T.H. that if he ever lost his job because of her, "you better watch your back."

2.      In another argument around the same time, defendant punched T.H. in the throat.

3.      During the course of the marriage, defendant controlled all of the money.  If T.H. needed to buy groceries or family essentials, defendant would provide her with an ATM card and his PIN.

4.      In 2017, defendant believed T.H. was cheating on him.  He became enraged and attempted to shove the dining room table into T.H.  T.H. was able to get out of the way.  The table broke and dented the floor.

5.      In 2016-2017, while T.H. was seated in a car, the two argued and defendant punched her in the arm in front of the kids.

6.      In 2017, defendant punched T.H. in the back of her arm and shoulder area.  She fell and landed in a closet.

16

7. In 2008, while T.H. was pregnant, defendant became angry and threw a cup at her. The cup hit her stomach or leg.

8. In 2008, while T.H. was seven or eight months pregnant, defendant had been drinking all night and the two argued over his closing the bedroom window. A shoving match ensued, and defendant punched T.H. in the face, knocking her down and giving her a black eye.

9. In 2010, while T.H. was pregnant, defendant became upset and he threw a set of keys at her. The keys hit her stomach and drew blood.

10. In 2011, defendant accused T.H. of cheating on him. He grabbed her and choked her with both hands. Afterward, T.H. took the kids and went to a battered women's shelter, but she and defendant later reconciled.

11. In February 2012, during their reconciliation, T.H. admitted to defendant that she had confided in a friend that defendant had physically abused her. Upon hearing this, defendant ran upstairs and grabbed a gun out of a closet. He kneeled down, placed the barrel of the gun in his mouth, and began screaming and drooling. He remained angry at T.H. for her confiding in others.

12. In late summer or early fall of 2017, while T.H. was baking a pizza, L.H., excited for the meal, hung on the oven door and broke it. Defendant became enraged. He punched T.H. in the arm, causing her hand to come in contact with the hot pizza she had just pulled out of the oven. Defendant said she should have done a better job watching L.H. At T.H.'s urging, L.H. ran down the street to hide from defendant. Defendant looked for him, screaming "where is that little bastard," and "I'm going to smash his head in the oven door."

At a hearing on the request to admit the prior acts, the trial court stated as a tentative ruling that it intended to admit the evidence except for the two 2004-2005 incidents, which were more than 10 years old.

17

Defense counsel argued against the request. He claimed that admitting the evidence of uncharged acts before the assertions could be proven prejudiced defendant. Counsel stated, "[T]he whole point of 1109 is to say if he did it before, he'll do it again, and that's why he's guilty. And that's the inherent prejudice that comes from 1109, and that's why the Court has 352, to make sure my client receives a fair trial . . . ." Counsel asked for an Evidence Code section 402 hearing before the evidence was presented to the jury.

The trial court said it was familiar with Evidence Code section 1109 and its purposes, but it still intended to admit those instances that were within the statutory time period. It initially permitted evidence of defendant's control of the family finances but not necessarily under Evidence Code section 1109. It stated that *People v. Jennings, supra*, 81 Cal.App.4th 1301, held the statute to be constitutional.

The court continued: "And I think the Court, what the Court needs to do is weigh the probative value to its prejudicial value. [¶] In looking at these incidents that I'm going to go over again, to me, they are highly probative. I don't believe they're intended to provoke an emotional bias. And the prior offenses that are listed here, as described, are no more egregious than the charged offenses. So I don't think that they will at all confuse the jury. [¶] So I'm going to go ahead and allow those [nine] prior uncharged acts of domestic violence . . . to be admitted under 1109 and 352."

B.      Analysis

"Under [Evidence Code] section 352, a trial court may in its discretion exclude material evidence if its probative value is substantially outweighed by the probability that its admission will necessitate undue consumption of time, or create a substantial danger of undue prejudice, confusion of the issues, or misleading the jury. The weighing process under [Evidence Code] section 352 depends upon the trial court's consideration of the unique facts and issues of each case, rather than upon the mechanical application of

18

automatic rules. (*People v. Stewart* (1985) 171 Cal.App.3d 59, 65; *People v. Yu* (1983) 143 Cal.App.3d 358, 377.) We will not overturn or disturb a trial court's exercise of its discretion under [Evidence Code] section 352 in the absence of manifest abuse, upon a finding that its decision was palpably arbitrary, capricious and patently absurd. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125; *People v. Robbins* (1988) 45 Cal.3d 867, 880-881; *People v. Adams* (1980) 101 Cal.App.3d 791, 799; *People v. Cordova* (1979) 97 Cal.App.3d 665, 670.) 'The [trial] court's exercise of discretion under Evidence Code section 352 will not be disturbed on appeal unless the court clearly abused its discretion, e.g., when the prejudicial effect of the evidence clearly outweighed its probative value.' (*People v. Brown* (1993) 17 Cal.App.4th 1389, 1396.)" (*People v. Jennings, supra*, 81 Cal.App.4th at pp. 1314-1315.)

The record here demonstrates the trial court understood and fulfilled its responsibilities under Evidence Code section 352 and did not abuse its discretion in admitting the prior acts. The evidence was highly probative. It involved defendant inflicting abuse on the same victim over a period of years. The uncharged acts were similar to the charged acts, as they involved defendant hitting T.H., threatening her, throwing things, and putting her at risk of serious injury.

The evidence's probative value was not substantially outweighed by its risk of causing undue prejudice. The prior acts were not more inflammatory then the charged acts, especially when considered in light of the recordings of the charged acts which were played for the jury. Even defendant's character witnesses expressed dismay at defendant's recorded behavior. One character witness, a patrol commander with the county sheriff's office, stated that in his 27-year career, he had never heard anything like them. Another character witness avoided listening to the recordings. Asked why, he stated, "I know they're really bad, and I just don't want to hear them."

The evidence did not confuse the issues or mislead the jury, nor did introducing it unduly consume court time. The jury instruction regarding the evidence listed each

uncharged act separately and informed the jury how it could consider the uncharged acts. The primary focus of the trial and closing arguments was the charged offenses.

Defendant argues that although the uncharged acts individually are not particularly inflammatory, collectively they "painted a highly inflammatory picture of [his] behavior, beyond the allegations currently charged." Not so. The evidence was damaging to defendant's case, but it was not unduly prejudicial. " 'All evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging." ' [Citation.]" (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

The uncharged act evidence had much to do with the issues. "[I]n domestic violence cases in particular, a history or pattern of domestic violence is very probative." (*People v. Kerley* (2018) 23 Cal.App.5th 513, 536.) And "[e]vidence that [defendant] abused [the victim] multiple times is more probative than evidence that he did so once or twice; it is the frequency, regularity, and severity with which [defendant] beat [the victim] that infuses this propensity evidence with probative strength." (*Ibid*.)

Defendant criticizes the trial court for not examining on the record each of the elements of Evidence Code section 352 with each uncharged act. The court, however, was not required to do so. "[A]s the Supreme Court has repeatedly and recently reaffirmed, 'when ruling on [an Evidence Code] section 352 motion, a trial court need not expressly weigh prejudice against probative value, or even expressly state that it has done so. All that is required is that the record demonstrate the trial court understood and fulfilled its responsibilities under . . . [Evidence Code] section 352.' (*People v. Williams* (1997) 16 Cal.4th 153, 213, citing *People v. Lucas* (1995) 12 Cal.4th 415, 448-449.)" (*People v. Jennings, supra*, 81 Cal.App.4th at pp. 1314-1315.) The record here meets

20

this standard.  The trial court did not abuse its discretion by admitting the uncharged acts of domestic violence under Evidence Code section 1109.

V

*Sufficiency of the Evidence of Violating a Protective Order*

Any "intentional and knowing" violation of a protective order is a misdemeanor. (§ 273.6, subd. (a).)  To establish the crime, the prosecution must prove, among other things, that defendant knew about the order, he was able to comply with the order, and he intentionally violated the order.  (*Ibid*.)  The form instruction for this offense, CALCRIM No. 2701, required the prosecution to show that "the defendant knew of the court order and that he had the opportunity to read the order or to otherwise become familiar with what it said.  But the People do not have to prove that the defendant actually read the court order."

Defendant claims there is insufficient evidence that he had the opportunity to read the order or to otherwise become familiar with it.  We disagree.  The sheriff's deputy who served the order on defendant testified that he handed a copy of the order to defendant and explained to him what it was.  He did not read the entire protective order, but he told defendant what it was and that he was not to contact or be around any of the protected parties.

The deputy testified he left a copy of the order with defendant.  On cross-examination, the deputy stated he gave defendant a copy of the order initially to explain it to him, but when defendant left, the deputy may have given the order to the jail staff. However, the deputy did give defendant a chance to look at the order when he gave the copy to him.

This is sufficient evidence to affirm the conviction.  The prosecution had to establish that defendant knew of the protective order and that he had the opportunity to

21

read it or otherwise become familiar with what it said.  The deputy's testimony establishes this element.

DISCUSSION

The judgment is affirmed.

 

 

_____

HULL, J.

 

We concur:

 

_____

RAYE, P. J.

 

_____

RENNER, J.